UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>TROPIKGADGET FZE )<br>TROPIKGADGET UNIPESSOAL LDA )<br>SERGIO HENRIQUE TANAKA )<br>CARLOS LUIS DA SILVEIRA BARBOSA )<br>CLAUDIO DE OLIVEIRA PEREIRA CAMPOS )<br>VINICIUS ROMULO AGUIAR )<br>THAIS UTINO AGUIAR )<br>WESLEY BRANDAO RODRIGUES )<br>ANDREW ELLIOT ARRAMBIDE )<br>JULIO G. CRUZ )<br>DENNIS ARTHUR SOMAIO )<br>ELAINE AMARAL SOMAIO )<br>PABLO ANDRES GARCIA )<br>VIVIANE AMARAL RODRIGUES )<br>SIMONIA DE CASSIA SILVA )<br>GEOVANI NASCIMENTO BENTO )<br>PRISCILA BENTO )<br>)<br>Defendants, )<br>and )<br>)<br>UNINVEST FINANCIAL SERVICES, CORP. )<br>COMPASSWINNER LDA )<br>HAPPY SGPS SA )<br>PARKWAY REAL ESTATE LLC )<br>RST5 INVESTMENTS LLC )<br>PAULO HIDEKI KOGA )<br>)<br>Relief Defendants. )<br>) | Case No_____ |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("the Commission") alleges the following against Defendants and hereby demands a jury trial:

1

## PRELIMINARY STATEMENT

1.      This case involves a Ponzi and pyramid scheme operated by Tropikgadget FZE and Tropikgadget Unipessoal LDA (collectively "Tropikgadget" or "the Company") and fifteen individual Defendants:  three principals of Tropikgadget and twelve prominent promoters. Tropikgadget is a "multi-level marketing" company operating under the name of "Wings Network."  Although several of the individual Defendants and others have represented that Wings Network is in the business of providing digital and mobile solutions to customers through a multi-level marketing distribution network, in actuality Wings Network has operated as a fraudulent Ponzi and pyramid scheme.  From at least November 2013 and continuing through April 2014, Tropikgadget and its three principals and twelve promoters raised at least $23.5 million from thousands of investors, including many members of the Brazilian and Dominican immigrant communities in Massachusetts, through a fraudulent and unregistered offering of securities.  The securities took the form of membership packs that promised guaranteed monthly returns in exchange for becoming "promoters" of the business.

2.      Defendants have, by false statements and material omissions, fostered the misleading appearance that Wings Network operates as a legitimate business, to conceal the Defendants' operation of an elaborate Ponzi and pyramid scheme.  Based on information and belief, Tropikgadget had little or no revenue from product sales, yet collected more than $23 million in revenue from recruitment of investor "members."  As a result, in classic fashion, Tropikgadget paid its earlier investors, not with revenues from selling products or services, but with money received from later investors.

2

3.      The three principals of Tropikgadget have transferred over $16.5 million out of Tropikgadget's accounts.  That money was: 1) transferred abroad; 2) deposited in Defendants' personal accounts; 3) used to purchase a hotel; or 4) transferred to non-Tropikgadget related entities.

4.      On May 15, 2014, the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts ("Massachusetts Securities Division") filed an enforcement action against Wings Network, WingsNetwork, Wingsnetwork.com, Wings Networkglobal, and the various DBAs and website addresses of Tropikgadget, alleging that the parties individually and collectively had fraudulently sold unregistered securities and that these offers and sales were part of a pyramid scheme to defraud Massachusetts investors.

5.      Through the activities alleged in this Complaint, the Defendants have engaged in either: (a) fraudulent or deceptive conduct in connection with the purchase or sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; (b) fraud in the offer or sale of securities, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act"); and/or (c) the offer or sale of unregistered securities, in violation of Section 5 of the Securities Act.

6.      To halt the Defendants' ongoing unlawful conduct, maintain the status quo, and preserve any remaining assets for defrauded investors before entry of a final judgment, the Commission seeks emergency equitable relief, including a temporary restraining order and preliminary injunction to:

> a. prohibit Defendants from continuing to violate the relevant provisions of the federal securities laws;

3

b. freeze the Defendants' and the Relief Defendants' assets and otherwise maintain the status quo;

c. require Defendants and Relief Defendants to submit an accounting of investor funds and all other assets in their possession;

d. require Defendants and the Relief Defendants to repatriate assets that were transferred outside of the United States that are traceable to investor funds;

e. prohibit Defendants from soliciting or accepting additional investments;

f. prevent Defendants and Relief Defendants from destroying relevant documents; and

g. authorize the Commission to take expedited discovery.

7.      The Commission also seeks:  (a) a permanent injunction prohibiting the

Defendants from further violations of the relevant provisions of the federal securities laws;

(b) disgorgement of the Defendants' and relief Defendants' ill-gotten gains, plus pre-judgment

interest; and (c) civil penalties due to the egregious nature of the Defendants' violations.

## JURISDICTION

8.      The Commission seeks a permanent injunction and disgorgement pursuant to

Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act

[15 U.S.C. §78u(d)(1)].  The Commission seeks the imposition of civil penalties pursuant to

Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act

[15 U.S.C. §78u(d)(3)].

9.      The Court has jurisdiction over this case pursuant to Sections 20(d) and 22(a) of

the Securities Act [15 U.S.C. §§77t(d), 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange

Act [15 U.S.C. §§78u(d), 78u(e), 78aa].  Venue is proper in this District because Tropikgadget

4

transacted business in Massachusetts, the principals visited Massachusetts for the purpose of soliciting investors, and seven promoters live or have lived in Massachusetts.

10.     In connection with the conduct described in this Complaint, the Defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

11.     The Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS AND RELIEF DEFENDANTS

### I.DEFENDANTS
#### A.Tropikgadget Entities

12.     Tropikgadget Unipessoal LDA ("Tropikgadget Unipessoal") is a foreign entity incorporated in the Madeira Free Trade Zone in November 2013 with its principal place of business in Lisbon, Portugal. It withdrew its license from the Madeira Free Trade Zone in April 2014. Tropikgadget Unipessoal received investor funds in its bank accounts and made payouts to investors.

13.     Tropikgadget FZE is a foreign entity incorporated in the United Arab Emirates in November 2013 with its principal place of business in Lisbon, Portugal. Tropikgadget FZE holds the rights to Wings Network marketing and brand services, which includes but is not limited to, the names Wings Network, Wingsnetwork, and WingsNetwork.Com (collectively "Wings Network") and operates through Wings Network. Tropikgadget has never been registered with the Commission, nor has it ever registered any offering of securities under the

5

Securities Act or any class of securities under the Exchange Act. According to the Wings

Network website, Tropikgadget voluntarily suspended its U.S. operations in May 2014 after the

Massachusetts Securities Division filed an Administrative Complaint alleging that Wings

Network was operating a fraudulent pyramid scheme.

### B. Tropikgadget Principal Defendants

14.     Sergio Henrique Tanaka ("Tanaka"), age 40, of Sao Paulo, Brazil and Davie,

Florida, is president of the Board of Directors of Wings Network, although he has also been

referred to by others as the "President of Wings Network." He is the founder and president of

the Sawabona Group, a purported umbrella of fourteen companies in six countries: Tropikgadget,

Aikon LLC, 7 Payment Processor, Seta Points, Teleactive Portugal, Real Emperor, Data Center,

Coaching Club, Sawabona Resources Mining, Seta Global Sports, Inst. Investigacao Sawabona,

RHMTEC MMN and TNK Communicacao. Tanaka appeared in Wings Network promotional

videos on the internet. In February 2014, he traveled to the Boston, Massachusetts area to appear

at a Wings Network "Mega Business Event" and receive an appreciation plaque from Grupo

Internacional, a group of leading Wings Network promoters based in the United States. At least

one promoter told investors to wire payments to Tanaka's personal bank account.

15.     Carlos Luis da Silveira Barbosa ("Barbosa") of Lisbon, Portugal is the chief

executive officer of Wings Network. Barbosa appeared in many promotional videos and online

conferences for Wings Network on the internet. In April 2014, he traveled to Boston,

Massachusetts, where he presented at a Wings Network "Mega Business Event" about the

"launch of new product."

16.     Claudio de Oliveira Pereira Campos ("Campos") of Lisbon, Portugal is the Director of Operations of Wings Network.  Campos appeared in many promotional videos and online conferences for Wings Network on the internet, and traveled to several states including Massachusetts and Florida during 2014 to present at Wings Network promotional events.  In April 2014, he traveled to Boston, Massachusetts, to present at a Wings Network "Mega Business Event" for the "launch of new product."

### C. Tropikgadget Promoter Defendants

17.     Vinicius Romulo Aguiar ("Vinicius Aguiar"), age 42, of Marlborough, Massachusetts was a promoter of Wings Network.  According to the March 2014 Wings Network "Connect" magazine published on the Wings Network website, Vinicius Aguiar and his wife, Thais Utino Aguiar ("Thais Aguiar"), qualified for the Executive Director designation, a rank conferred by Wings Network, by accumulating at least $15 million from investors. According to Tropikgadget records, Vinicius Aguiar generated commissions of at least $1,302,880 from the sale of Wings Network membership packs.  Vinicius Aguiar conducted his Wings Network activities through Grupo Internacional.  He appeared in many promotional videos and online conferences for Wings Network on the internet; traveled to several states including Connecticut, Florida, Massachusetts and Pennsylvania during 2014 to present at Wings Network promotional events; and promoted Wings Network on social media, and a Wings Personal Page.  He organized the February 2014 Wings Conference in Massachusetts featuring Tanaka.  Vinicius Aguiar and Thais Aguiar spoke at the April 2014 "Mega Business Event" in Boston, Massachusetts featuring Barbosa and Campos and the "launch of new product."  He was

7

a director of BRAZUSA Communication Company, a Massachusetts corporation that he formed with Thais Aguiar in July 2009.

18.    Thais Aguiar, age 34, of Marlborough, Massachusetts was a promoter of Wings Network. She appeared in online promotional videos for Wings and traveled to several states to present at Wings promotional events. The Aguiars spoke at the April 2014 "Mega Business Event" in Boston, Massachusetts featuring Barbosa and Campos and the "launch of new product."

19.    Andrew Elliot Arrambide ("Arrambide"), age 47, of Sandy, Utah, was a promoter of Wings Network. According to the April 2014 Wings Network "Connect" magazine published on the Wings Network website, Arrambide achieved the Director rank, indicating that he had accumulated at least $6 million from investors. He conducted his Wings Network activities through Grupo Internacional. He appeared in many promotional videos and online conferences for Wings Network on the internet; traveled to several states including Florida and Massachusetts during 2014 to present at Wings Network promotional events; and promoted Wings Network on social media and on his personal website on the internet. He traveled to the Boston, Massachusetts area in February 2014 where he presented at a Wings Network "Mega Business Event.

20.    Julio G. Cruz ("Cruz"), age 34, of Duluth, Georgia, was a promoter of Wings Network. According to the April 2014 Wings Network "Connect" magazine, Cruz achieved the Director rank, indicating that he had accumulated at least $6 million from investors. He appeared in promotional videos for Wings Network on the internet; traveled to several states

8

including Texas during 2014 to present at Wings Network promotional events; and promoted Wings Network through social media.

21.     Wesley Brandao Rodrigues ("Wesley Rodrigues"), age 28, of Marlborough, Massachusetts, was a promoter of Wings Network. According to the February 2014 Wings Network "Connect" magazine published on the Wings Network website, Wesley Rodrigues achieved Senior Manager rank, indicating that he had accumulated at least $1.5 million from investors. According to Tropikgadget records, Wesley Rodrigues generated commissions of $791,745 from the sale of Wings Network membership packages. Wesley Rodrigues conducted his Wings Network activities through Cawboy Services, Inc. ("Cawboy"), a Massachusetts corporation, as well as Grupo Internacional. He appeared in a promotional video for Wings Network that he posted on the internet; traveled to several states including California and Utah during 2014 to present at Wings Network promotional events; owned and operated a Wings Network branded car through Cawboy; and promoted Wings Network on social media and his Wings Recruiter page hosted on the Wings Network website

22.     Dennis Arthur Somaio ("Dennis Somaio"), age 35, of Marlborough, Massachusetts, was a promoter of Wings Network. Dennis Somaio conducted his Wings Network activities through Grupo Internacional. He appeared in promotional videos for Wings Network on the internet; traveled to several states including Connecticut and Pennsylvania during 2014 to present at Wings Network promotional events; and promoted Wings Network through social media.

23.     Elaine Amaral Somaio ("Elaine Somaio"), age 35, of Marlborough, Massachusetts, was a promoter of Wings Network. According to Tropikgadget records, Elaine

9

Somaio generated commissions of $557,240 from the sale of Wings Network membership packs. Elaine Somaio conducted her Wings Network activities through Grupo Internacional.  She promoted Wings Network through social media.

24.     Pablo Andres Garcia ("Garcia"), age 38, of Waco, Texas, was a promoter of Wings Network.  According to Tropikgadget records, Garcia generated commissions of $550,135 from the sale of Wings Network membership packs.

25.     Viviane Amaral Rodrigues ("Viviane Rodrigues"), age 37, of Clinton, Massachusetts, was a promoter of Wings Network.  According to the April 2014 Wings Network "Connect" magazine, Viviane Rodrigues achieved the Director level indicating that she had accumulated at least $6 million from investors.  According to Tropikgadget records, Viviane Rodrigues generated commissions of at least $434,150 from the sale of Wings Network membership packs.  Viviane Rodrigues conducted her Wings Network activities through Grupo Internacional.  She appeared in many promotional videos and online conferences for Wings Network on the internet; traveled to several states including Florida and Pennsylvania during 2014 to present at Wings Network promotional events; and promoted Wings Network through social media.

26.     Simonia De Cassia Silva ("Silva"), age 43, of Massachusetts, was a promoter of Wings Network.  According to Tropikgadget records, Silva generated commissions of $419,900 from the sale of Wings Network membership packs.  She temporarily moved and used an office space in Pompano Beach, Florida where she and Vinicius Aguiar promoted Wings Network locally.

27.     Geovani Nascimento Bento ("Geovani Bento"), age 41, of Marlborough, Massachusetts, was a promoter of Wings Network. According to Tropikgadget records, Geovani Bento generated commissions of $163,845 from the sale of Wings Network membership packs. Geovani Bento conducted his Wings Network activities through Success Wealth101, Inc. and Grupo Internacional. He promoted Wings Network on his Wings Recruiter page hosted on the Wings Network website.

28.     Priscila Bento, age 36, of Marlborough, Massachusetts, was a promoter of Wings Network. She made Wings Network presentations online and at an Atlanta, Georgia hotel.

## II. Relief Defendants

29.     Uninvest Financial Services, Corp. ("Uninvest") is a Florida corporation with its principal place of business in Deerfield Beach, Florida. Its registration identifies President Paulo Koga as an officer. Its bank account received approximately $2.45 million in Wings Network-related deposits between November 2013 and March 2014.

30.     Compasswinner LDA ("Compasswinner") is a Portugal corporation with its principal place of business in Setubal, Portugal. Compasswinner received a wire transfer of €7 million (or approximately $8.7 million) from Tropikgadget on May 8, 2014.

31.     Happy SGPS SA ("Happy") is a Portugal corporation with its principal place of business in Santa Cruz, Madeira, Portugal. On June 19, 2014, Happy became the parent company of Tropikgadget Unipessoal. Its registration identifies Chairman Sergio Henrique Tanaka and Member Luis Carlos da Silveira Barbosa as officers. On May 12, 2014, Happy

received a wire transfer of approximately €950,000 (or approximately $1.18 million) from Tropikgadget.

32.     Parkway Real Estate LLC ("Parkway") is a Florida corporation which had its principal place of business in Deerfield Beach, Florida. Its registration identifies Uninvest as Manager. Parkway received three wire transfers totaling approximately $290,000 from Uninvest between February 5, 2014 and April 9, 2014.

33.     RST5 Investments LLC ("RST5") is a Delaware corporation which had its principal place of business in Deerfield Beach, Florida. Its registration identifies Uninvest as Manager. RST5 received twenty-nine wire transfers totaling approximately $1,734,716 from Uninvest between April 9, 2014 and December 22, 2014.

34.     Paulo Hideki Koga ("Koga"), age 40, of Campinas, Brazil, is the President of. Koga-controlled bank accounts received thirteen transfers totaling approximately $570,750 from Uninvest between November 1, 2013 and May 21, 2014.

## FACTUAL ALLEGATIONS,

### I. Tropikgadget's Start

35.     Tropikgadget FZE is an entity currently incorporated in Dubai, United Arab Emirates and based in Lisbon, Portugal that holds the marketing rights to Wings Network. Tanaka, who founded the Company, is the President, Barbosa is the CEO and Campos is the Director of Operations. On or about April 5, 2014, Wings Network held its "USA Launch Party" in Boston. However, the Company began operating in the United States from at least as early as November 7, 2013, by building its distribution network of associates or members.

36.     In various media, including websites, presentations, social media, YouTube videos and personal appearances, the Promoter Defendants and others represented that Tropikgadget, through "Wings Network," was in the business of selling games, apps, cloud storage, marketing tools and a personal page.  The Wings Network website represented that it was "a company with an innovative view of using Multi-level as a global sales channel of Online and Mobile Marketing Solutions."  In actuality, Tropikgadget never provided most, if any, of these types of products to its Wings Network members to sell while operating in the United States.  Instead, its members only received tools suited to one use – to recruit new members.

## II. Recruitment of Members But No Requirement to Sell Product

37.     Although Wings Network purported to use a multi-level distribution network to sell products and services, it had little or no revenue from the sale of those products or services.  Instead, to the extent that it and its members obtained revenue, that revenue was derived from the recruitment of new members.  In fact, its own procedures made it clear that members were not required to sell products to receive promised profits – simply recruiting other members to purchase membership packs was enough.

### A. Lack of a Real Product

38.     Wings Network's presentations and solicitations presented a wide array of impressive-sounding statistics concerning the size and profitability of the digital mobile market followed by statements that Wings Network, as the "First Mobile Multilevel" with "members in 70 countries," would help you "achieve your dreams and enjoy your life."  The Wings Network website further explained that "[w]e are a company with an innovative view of using Multi-level as a global sales channel of Online and Mobile Marketing Solutions."

13

39.     The Wings Network website and presentations provided very little information regarding the product line it claimed to be selling.  For example, the website vaguely stated that "Wings offers you games, apps, cloud storage, marketing tools and Personal Page," while a section labeled "Product & Solutions" merely listed Personal Page, Recruiter and Apps offerings. Wings Network's presentations were designed to, and did, leave investors who attended presentations confused about what products, if any, were being offered by Wings Network.

40.     The "Personal Page" provided by Wings Network was an easily replicated website designed "to promote products and services" while the "Recruiter tool" provided "tools designed for customer prospecting."  Wings Network only provided the Personal Page and Recruiter tools to members to aid the members' promotion of Wings Network recruiting new members.  The limited functionality of the Personal Page and Recruiter Tool rendered those applications useful only for purposes of recruiting new investors, with no commercial value as stand-alone products.

41.     The typical rudimentary promoter Personal Page, hosted on the Wings Network website, promoted Wings Network events, answered frequently asked questions about Wings Network, and included several videos promoting Wings Network events.

42.     A typical rudimentary Recruiter tool consisted of a single landing page hosted on the Wings Network website that solicited new members by stating "A new way to realize their dreams; Complete the form below to learn more about Wings Network, a legalized company, new and bold."

43.     As the scheme evolved, Campos, the Director of Operations, made vague promises that revolutionary new products were in development.  At various times, Campos

14

referred to a program he called "Wings Commerce," which he stated would further aid members

in marketing Wings Network's product line.  Campos further represented that the Wings

Network product line was growing and would include new offerings, such as "Wings Fly,"

which Campos described as an online flight booking service, and "Wings Resort," which

Campos described as a time-share vacation properties company.

     44.     In a YouTube video recording of a February 27, 2014 webinar, Campos stated:

> We are already developing - - developing a proposal with the technology
> department Wings Commerce- - Commerce that will also be part of the tools we
> already have, but another set of online marketing tools.  Wings Fly and Wings
> Resort are – are products that we will launch in the next- - I would say, next
> month, next March we will try to present to you how this product works.  Resort
> will come more towards April, Wings Fly already in March. Both will deal with
> travel and tourism area or business trips but Wings Fly is related to airfare and
> Wings Resort is a timeshare in the Orlando lodging area.

     45.     Wings Network never launched Wings Commerce, Wings Fly and/or Wings

Resorts. On April 10, 2014, Wings Network launched a Wings Cloud app providing access to

internet data storage and on May 8, 2014, it launched a Wings Communicator VoIP

communications services app.  Wings Network offered both of these apps for free download.

     46.     Wings Network, Campos, and at least one Defendant promoter described Wings

Communicator as a combination of industry leading apps such as Skype, WeChat, WhatsApp,

and Waze.

     47.     In actuality, the VoIP product was uncompetitively priced in an already crowded

market offering more innovative and mature apps charging lower fees to access VoIP service.

To access the purported VoIP service accessible through the free Wings Communicator VoIP

app, a user would be charged $49.  Moreover, even if the product were positioned to garner a

significant number of customers, the sales of the product would not be credited to investors in the marketing network.

### B. Recruitment Efforts

48.     Wings Network initially recruited members through a sophisticated website and online presentations conducted by Barbosa and Campos. Billing Wings Network as the "first Mobile Multilevel in the world" and "a global company that develops innovative Mobility solutions, with direct sales," Barbosa and Campos hosted the first official Wings Network online conference (or webinar) on January 30, 2014, and the second on February 13, 2014—posting both on YouTube.

49.     After establishing a network of lead promoters from amongst its initial members, Wings Network grew rapidly by recruiting new members using traditional face-to-face sales and social media (Facebook, YouTube, online conferences).

50.     Several of the Promoter Defendants and others hosted Wings Network "business events" at local hotels and other locations where they presented the Wings Network "business opportunity." The promoters used Facebook to publicize "business meetings" at locations in Connecticut, California, Florida, Massachusetts, Pennsylvania, Texas, and Utah.

51.     Promoters also set up Wings Network "store fronts" or "training centers" to present Wings Network to potential investors. For example in a "store front" in downtown Philadelphia, Pennsylvania, Dennis Somaio made presentations to prospective investors.

52.     In Pompano Beach, Florida, Silva rented an office space for a "training center" and attracted prospective investors to the center to hear presentations by Silva and Vinicius Aguiar

53.     In early April 2014, Wings Network held a USA Launch party in the Boston area. Speakers included principals Campos and Barbosa, and promoters Vinicius and Thais Aguiar, Wesley Rodrigues, Dennis Somaio, Geovani Bento, and Viviane Rodrigues. Campos discussed the Wings Network compensation plan and the Company's various "products," and made exaggerated claims as to the novelty and security of Wings Cloud. Barbosa likewise mischaracterized the novelty of Wings Networks "products" and made lulling statements regarding bonus payments. Geovani Bento then handed out awards to promoters who had reached certain milestones, such as Vinicius and Thais Aguiar, Dennis Somaio, Viviane Rodrigues, and Wesley Rodrigues, all of whom thanked Wings Networks, its principals and high level promoters for changing their lives and helping them to achieve their dreams.

## III. The Tropikgadget Investment Program
### A. Membership Options

54.     Promoters recruited investors to purchase memberships. Tropikgadget charged a $49 membership fee to its investors. Wings Network materials represented that the membership fee qualified the member to receive a sales bonus equal to 25% of future Wings Network total sales. That $49 membership fee, however, did not provide the member with access to the Personal Page and Recruiter tools to be used for multi-level marketing sales. More importantly, the $49 fee did not entitle the member to participate in Wings Network's more lucrative compensation plan.

55.     To participate in the compensation plan, the member had to invest in one of three investment vehicles, described as "membership packs": 1) the $299 Start Pack; 2) the $749 Executive Pack; and 3) the $1,499 Elite Pack. Each of these packs came with an increasing

17

number of "points" that could be exchanged for compensation, a personal page with increasing

numbers of templates, and a recruiting system including an increasing number of landing pages,

banners and Facebook covers as follows:

| Member Pack | Price | Initial Points | Personal Page | Recruiter | Communicator | Cloud |
|---|---|---|---|---|---|---|
| Start | $299 | 100 | 1 standard version | 1 landing page 2 banners 2 Facebook covers | Access to the discounts pack: 1 | 10 GB of space |
| Executive | $749 | 250 | 3 standard version | 3 landing page 4 banners 4 Facebook covers | Access to the discounts pack: 2 | 20 GB of space |
| Elite | $1,499 | 500 | 6 standard version | 6 landing page 10 banners 10 Facebook covers | Access to the discounts pack: 3 | 40 GB of space |

56.     None of the packs provided any mechanism for the member to sell actual products

or services to the general public. Instead, the packs simply provided an increasing number of

tools to allow members to recruit more members of Wings Network.

57.     Several of the Defendant Promoters and others promised in their Wings Network

marketing materials that purchasers of the "membership packs" would receive monetary returns

for their investments and for their recruitment efforts. For example, Elite Pack purchasers were

promised that they would earn $750 per month through the first year of activity by merely

recruiting additional members at the Elite Pack level.

**B. Incentives for Investors Unconnected to the Sale of a Product or Service**

58.     Wings had a multi-level marketing structure, with eight bonus plans for investors

who recruited new investors. Only one of the eight bonus plans—the sales bonus plan —had any

relationship to the sale of an actual product. Wings Network's internal documents indicated that

no payments were made to any member based upon the sales bonus plan.  Vinicius Aguiar,

Viviane Rodrigues, and Priscilla Bento told investors that they simply had to purchase a

membership pack and recruit additional members in order to qualify for bonuses.

59.    The Wings Network materials, as well as several promoters, promised purchasers

of various membership packs payment based upon a variety of factors, measured through a

system of "points" that included: 1) the number of additional members they recruited; 2) the

number of additional members recruited by successive layers of new recruits stemming from the

member's recruiting efforts; 3) the number of total membership products sold throughout Wings

Network; and 4) the price level of the membership packs purchased.

60.    Although, as noted above, the Wings Network compensation plan included

provisions that offered a bonus based on sales of products, Tropikgadget records reflect that

Wings Network never paid any such bonuses.  Moreover, promoters, including Priscila Bento,

represented to investors that no product sales were required to receive compensation from the

company.

## IV. Misrepresentations and Omissions Regarding Wings Network
### A. Wings Network is a Pyramid Scheme

61.    Notwithstanding efforts by Defendants to portray it as a multi-level marketing

company for the sales of goods and services, Wings Network was a pyramid scheme.  Unlike

legitimate multi-level marketing companies, which commonly base compensation on sales of

products or services, Wings Network offered returns on investment that were wholly

unconnected to actual product sales; Wings Network promised returns that were based solely on

amounts invested and additional members recruited.

62.     For example the Bentos' marketing materials used to recruit prospective investors in Massachusetts represented that if investors purchased the Elite Pack and sold Elite Packs to new members, they would receive a monthly Consultant Bonus of $750.

63.     Similarly, during presentations Viviane Rodrigues and Vinicius Aguiar represented to prospective investors that if they purchased the Elite Pack and sold two Elite Packs to new members, they would receive a monthly Consultant Bonus of $750.

64.     Wings Network's revenues derived solely from selling Member Packs. Wings Network's records reflect no revenue from product sales. The sole apparent source of revenue for the business consists of fees associated with the sales of "membership packs." As with any pyramid scheme, such revenues can be sustained only by additional recruitment of new members, in exponentially expanding numbers. Such growth is ultimately impossible and yields insufficient cash flow to cover obligations to the vast majority of members who invested in Wings Network.

65.     Wings Network sales and commission records for Massachusetts from November 7, 2013, to April 25, 2014, reflect that Wings Network experienced a net loss of approximately $2 million. This calculation reflects revenue of approximately $12.5 million from the Member Packs sales minus expenses of $14.5 million from the recruitment-based bonuses that were credited to members' accounts (although most of these bonuses were never actually paid). To the extent that Wings Network operated as a business, this represents a significant loss (on a per-unit or absolute basis) over the six month time period.

**B. <u>Defendants Falsely Claimed a "Relationship" with the Direct Selling Association</u>**

66.    During presentations to potential investors, Barbosa and at least one promoter showed investors copies of what they claimed was Wings Network's application to become a member of the Direct Selling Association ("DSA"). The DSA is a national trade association of approximately 200 multilevel marketing companies that promotes the interests of its members and maintains a Code of Ethics adherence to which is listed as a condition of membership.

67.    Direct selling companies are admitted to the association following a minimum one-year vetting period. During that time the company's business plan is reviewed to verify compliance with all provisions of DSA's Code of Ethics. At present, only companies with direct selling operations in the U.S. are eligible for membership.

68.    Wings Network principals falsely claimed that the company had successfully passed through a "pre-analysis" or "pre-screening" process for the DSA, including a preliminary review of the sustainability and legality of the company.

69.    For example, Barbosa represented in a YouTube video:

So, what happens is that DSA has a series of forms.  They are pre-analysis forms.  And, uh, some time passed, in our case it was three weeks.  And if everything passes the pre-analysis that they do on our company - - whether it be the verification or the legality  of the company's charter, or whether it be the analysis of our website, of our products, and of our compensation plan – based on this analysis we will move on to the next phase. This document that is on the screen is a document of the second phase of the process of joining DSA, which means that the pre-analysis that they did on our project was positive and we move onto phase two, which is the phase that we are in now.

70.    In actuality, the DSA does not have a pre-analysis or pre-screening process. Moreover, the DSA's records do not reflect any membership, or application for membership, in the name of Wings Network.

71.     The DSA did send an application to Wings Network in response to an e-mail request but it never heard back from Wings Network nor did it receive a completed form.

72.     In April 2014, after the DSA's compliance monitoring team became aware that Wings Network was claiming membership, the DSA sent Wings Network a cease and desist letter to stop representing that DSA had any connection with Wings Network.

## C. Wings Network Falsely Promised That Members' Initial Investments Were Protected by an Insurance Policy

73.     Campos, Viviane Rodrigues, Vinicius Aguiar, and other promoters represented to prospective investors that their initial investments in the Member Packs would be 100% guaranteed through insurance issued by Porto Seguro, the fourth-largest insurance company in Brazil.  In making these claims, Campos, Viviane Rodrigues and Vinicius Aguiar pointed to the existence of Porto Seguro S.A. insurance associated with the Wings Card, a debit card issued to Wings Network members for payment processing.  In a YouTube video that solicited investors to purchase Wings Network memberships, Campos guaranteed that everything purchased by the investors would be insured for a year by Porto Seguro.  In their presentations to investors, Rodrigues and Aguiar emphasized that the investments were guaranteed while juxtaposing the Porto Seguro logo.  Viviane Rodrigues and Vinicius Aguiar also included a slide purportedly of a Porto Seguro insurance policy.

## D. Defendants Failed to Make Promised Refund Payments and Payments for Recruitment of New Members.

74.     To encourage investments in Wings Network, Barbosa and Campos represented that investors could receive full refunds if they cancelled their investment within fourteen days of

signing up as members. According to two investors, Campos directly promised them refunds. Yet investors did not receive the promised returns even after repeated requests.

75.    Moreover, although Barbosa, Campos, and several Wings Network promoters promised payments to investors for the recruitment of new members (an integral part of the Wings Network distribution structure), upon information and belief, investors never received any such payments. Wings Network members earned points that purportedly could be redeemed for cash commissions pursuant to the various recruitment bonuses outlined in the Wings Network compensation plan. However, all investors interviewed by SEC staff who attempted to redeem their "points" were unable to withdraw any money.

76.    Barbosa and Campos represented that Wings Network would wire bonus or membership cancellation payments to members' bank accounts from a Wells Fargo account. After Wells Fargo closed the account in April 2014, Barbosa began lulling victims by stating that Wells Fargo claimed it had wired payments to members from the Wells Fargo account, and any member who did not receive their payment should provide proof in the form of their bank account statement.  In actuality, as Barbosa well knew, there had been not even been any attempts to transfer money to members from the Wells Fargo account.

77.    Barbosa and Campos also promised members that they would be able to withdraw their money utilizing the Wings Card, which – they claimed – would enable transfers from the member's Wings Network account to a debit card. Many investors never received a Wings Card, and most of those who did receive cards found that the cards did not work.

## FIRST CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against Defendants Tropikgadget FZE, Tropikgadget Unipessoal LDA, Barbosa, and Campos)

78.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1-77 of the Complaint as if set forth fully herein.

79.     Defendants Tropikgadget FZE, Tropikgadget Unipessoal LDA, and their

principals Barbosa and Campos, directly or indirectly, acting intentionally, knowingly or

recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in

connection with the purchase or sale of securities have made or are making untrue statements of

material fact or have omitted or are omitting to state a material fact necessary to make the

statements made, in the light of the circumstances under which they were made, not misleading.

80.     As a result, Defendants have violated and, unless enjoined, will continue to

violate Section 10(b) of the Exchange Act [15 U.S.C.§78j(b)] and Rule 10b-5(b) thereunder [17

C.F.R. §240.10b-5(b)].

## SECOND CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Against Defendants Tropikgadget FZE, Tropikgadget Unipessoal LDA, Tanaka, Barbosa, and Campos)

81.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1-77 of the Complaint as if set forth fully herein.

82.     Defendants Tropikgadget FZE, Tropikgadget Unipessoal LDA, and their

principals, Tanaka, Barbosa, and Campos, directly or indirectly, acting intentionally, knowingly

or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in

connection with the purchase or sale of securities: (a) have employed or are employing devices,

schemes or artifices to defraud; and/or (b) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

### THIRD CLAIM FOR RELIEF
**(Violation of Section 17(a)(1) of the Securities Act Against Defendants Tropikgadget FZE, Tropikgadget Unipessoal LDA, Tanaka, Barbosa, and Campos )**

83.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-77 of the Complaint as if set forth fully herein.

84.     Defendants, directly and indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails have employed or are employing devices, schemes or artifices to defraud.

85.     As a result, Defendants have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. §77q(a)(1)].

### FOURTH CLAIM FOR RELIEF
**(Violation of Section 17(a)(2) of the Securities Act Against Defendants Tropikgadget FZE, Tropikgadget Unipessoal LDA, Barbosa, and Campos)**

86.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-77of the Complaint as if set forth fully herein.

87.     Defendants Tropikgadget FZE, Tropikgadget Unipessoal LDA, Barbosa, and Campos by engaging in the conduct described above in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails obtained property by means of untrue statements of material fact or omissions to state a material fact necessary to make the statements not misleading.

88.     As a result, Defendants have violated and, unless enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. §77q(a)(2)].

## FIFTH CLAIM FOR RELIEF
### (Violation of Section 17(a)(3) of the Securities Act Against Defendants Tropikgadget FZE, Tropikgadget Unipessoal LDA, Tanaka, Barbosa, and Campos)

89.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-77 of the Complaint as if set forth fully herein.

90.     Defendants Tropikgadget FZE, Tropikgadget Unipessoal LDA, Tanaka, Barbosa and Campos by engaging in the conduct described above in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

91.     By engaging in the conduct described above, the Defendants violated, and unless enjoined will continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(3))].

## SIXTH CLAIM FOR RELIEF
### (Violation of Section 5(a) and (c) of the Securities Act by Defendants)

92.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-77 of the Complaint as if set forth fully herein.

93.     Defendants Tropikgadget FZE and Tropikgadget Unipessoal LDA (and their dba Wings Network) have never been registered with the Commission, nor have they ever registered or attempted to register any offering of securities under the Securities Act or any class of securities under the Exchange Act.

94.     Defendants Tropikgadget FZE and Tropikgadget Unipessoal LDA, and their owners and promoters, directly or indirectly:  (a) have made or are making use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) have made or are making use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

95.     As a result, Defendants have violated and, unless enjoined, will continue to violate Section 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

### SEVENTH CLAIM FOR RELIEF
**(Unjust Enrichment of Relief Defendants Against Uninvest Financial Services, Corp.,
Compasswinner LDA, Happy SGPS SA, Parkway Real Estate LLC,
RST5 Investments LLC, and Paulo Hideki Koga)**

96.     The Commission repeats and incorporates by reference the allegations in paragraphs 1- of the Complaint as if set forth fully herein.

97.     Uninvest Financial Services Corp., Compasswinner Ltda, Happy SGPS SA, Parkway Real Estate LLC, RST5 Investments LLC, and Paulo Hideki Koga, have no legitimate interest in, or right to, the funds they received directly or indirectly from Tropikgadget FZE and/or Tropikgadget Unipessoal LDA, which represent the proceeds of the fraud alleged above.

98.     As a result, relief Defendants are liable for unjust enrichment and should be required to return their ill-gotten gains, with pre-judgment interest.

27

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.     Enter a temporary restraining order, preliminary injunction, order freezing assets, and order for other equitable relief in the form submitted with the Commission's motion for such relief;

B.     Enter a permanent injunction restraining the Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of:

1.     Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5] as to Defendants Tropikgadget FZE, Tropikgadget Unipessoal LDA, Campos, Barbosa, and Tanaka;

2.     Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] as to Defendants Tropikgadget FZE, Tropikgadget Unipessoal LDA, Campos, Barbosa, and Tanaka;

3.     Section 5 of the Securities Act [15 U.S.C. §77e] as to all Defendants;

C.     Require the Defendants and relief Defendants to disgorge their ill-gotten gains, plus pre-judgment interest, with said monies to be distributed as ordered by the Court;

D.     Order the Defendants to pay appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

E.     Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.    Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Deena R. Bernstein (Mass. Bar No. 558721)
   Senior Trial Counsel
David London (Mass Bar. No. 638289)
   Senior Enforcement Counsel
Martin F. Healey (Mass. Bar. No. 227550)
   Regional Trial Counsel
Amy Gwiazda (Mass. Bar 663494)
   Assistant Regional Director
Dawn Edick (Mass. Bar No. 641659)
   Senior Enforcement Counsel
Scott Stanley (N.Y. Bar No. 4504601)
   Enforcement Counsel

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street
Boston, MA  02110
(617) 573-8813  (Bernstein direct)
(617) 573-4590  (fax)
bernsteind@sec.gov  (Bernstein email)

Dated:  February 25, 2015