UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 15-cv-10543-ADB |
| | * | |
| TROPIKGADGET FZE., et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |
| and | * | |
| | * | |
| UNIVEST FINANCIAL SERVICES CORP., et al., | * | |
| | * | |
| Relief Defendants | * | |

## MEMORANDUM AND ORDER ON MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS TROPIKGADGET FZE, TROPIKGADGET UNIPESSOAL LDA, COMPASSWINNER LDA, AND HAPPY SGPS SA

### I.    INTRODUCTION

In February 2015, Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") filed this civil enforcement action against three companies, fifteen individual defendants, and several relief defendants. This case arises out of an alleged pyramid scheme that was purportedly operated by defendants Tropikgadget FZE and Tropikgadget Unipessoal LDA (collectively, "Tropikgadget"), through their principals, defendants Sergio Henrique Tanaka ("Tanaka"), Carlos Luis da Silveira Barbosa ("Barbosa"), and Claudio de Oliveira Pereira Campos ("Campos"). In addition to the Tropikgadget entities and their principals, the SEC named several "relief" defendants, who allegedly received wire transfers from Tropikgadget consisting of illicit proceeds and profits of the alleged pyramid scheme. Two of these relief defendants are Compasswinner LDA ("Compasswinner") and Happy SGPS SA ("Happy").

Tropikgadget FZE, Tropikgadget Unipessoal LDA, Compasswinner, and Happy (together, the "Portuguese defendants") are all corporations incorporated outside the United States, with their principal places of business in Portugal. On March 16, 2015, the Court (Talwani, J.) ordered that the Portuguese defendants be served with process by overnight mail. [ECF No. 55]. After those delivery attempts failed, I subsequently allowed the SEC's motion to serve the Portuguese defendants by publication. [ECF No. 118].[1]  The SEC was ordered to publish a notice once per week for three consecutive weeks in three newspapers in Portugal and southern Florida. On July 24, 2015, the SEC certified that it had served the Portuguese defendants by publication as ordered. [ECF No. 138]. To date, none of the Portuguese defendants has filed an answer or otherwise appeared in this action. On September 1, 2015, the Clerk entered Notices of Default as to the Portuguese defendants pursuant to Fed. R. Civ. P. 55(a). Presently before the Court is the SEC's Motion for Default Judgment against the Portuguese defendants pursuant to Fed. R. Civ. P. 55(b). [ECF No. 165]. For the following reasons, the SEC's Motion is <u>ALLOWED</u>.

## II.    LEGAL STANDARD

As set forth in Fed. R. Civ. P. 55(b), "a plaintiff 'must apply to the court for a default judgment' where the amount of damages claimed is not a sum certain." <u>Vazquez-Baldonado v. Domenech</u>, 792 F. Supp. 2d 218, 221 (D.P.R. 2011) (quoting Fed. R. Civ. P. 55(b)). As to the issue of liability, the entry of default "constitutes an admission of all facts well-pleaded in the complaint . . . ." <u>Id.</u> (internal quotations and citations omitted). Because the Portuguese

---

[1] Both Judge Talwani and the undersigned allowed the SEC's motions for alternative service with one caveat – that the Court was not ruling on the adequacy of such service. In both instances, the Court noted that the adequacy of service may be challenged at a later time. To date, however, none of the Portuguese defendants has appeared to contest jurisdiction or the adequacy of service of process in this case.

defendants have defaulted in this case, they are "taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability." In re The Home Restaurants, Inc., 285 F.3d 111, 114 (1st Cir. 2002). On a motion for a default judgment, however, it is appropriate to independently "examine a plaintiff's complaint, taking all well-pleaded factual allegations as true, to determine whether it alleges a cause of action." Ramos-Falcon v. Autoridad de Energia Electrica, 301 F.3d 1, 2 (1st Cir. 2002). Assuming that the facts alleged state a viable cause of action, the defendant's liability will be established.

With regard to damages, Fed. R. Civ. P. 55(b)(2) provides that the court "may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." A hearing, however, is not necessarily required, particularly where the facts alleged in the pleadings, together with affidavits submitted by the moving party, establish the amount of the default judgment. See In re The Home Restaurants, Inc., 285 F.3d at 114 (holding that district court did not abuse its discretion by entering default judgment without first holding evidentiary hearing, where there was "no uncertainty about the amounts at issue," the pleadings contained "specific dollar figures," and the court requested and received affidavits in support of the default judgment).

The SEC has submitted a Memorandum in Support of its Motion for Default, [ECF No. 166], as well as a Fourth Declaration of John McCann, a forensic Staff Accountant with the SEC. [ECF No. 166-1] ("McCann Decl."). In its Memorandum, the SEC argues that the facts alleged in its Complaint establish that Tropikgadget violated federal securities laws by (1) selling or offering to sell unregistered securities in interstate commerce, and (2) making false and misleading statements in connection with the sale or offering of its securities, upon which

statements its investors relied in connection with Tropikgadget's fraudulent pyramid scheme. The SEC argues that, based on the facts alleged in its Complaint, the Commission is entitled to a permanent injunction against Tropikgadget, as well as disgorgement of Tropikgadget's ill-gotten gains, together with prejudgment interest. The SEC also seeks civil monetary penalties against both Tropikgadget entities. In addition, the SEC argues that the facts alleged in the Complaint establish that relief defendants Compasswinner and Happy received wire transfers from Tropikgadget, consisting of proceeds from Tropikgadget's alleged pyramid scheme. The SEC argues that these assets are now subject to disgorgement, and it seeks corresponding relief against Compasswinner and Happy. The McCann Declaration sets forth the specific disgorgement amounts requested by the SEC and describes how those figures were calculated.

In this Memorandum and Order, the Court will address the adequacy of the Complaint to establish liability, as well as the remedies requested by the SEC.

## III.   SUMMARY OF RELEVANT FACTS

The salient facts alleged in the SEC's Complaint, [ECF No. 1] ("Compl.")), are summarized below. The Court accepts these facts as true for purposes of this Motion. See Conetta v. Nat'l Hair Care Centers, Inc., 236 F.3d 67, 76 (1st Cir. 2001) (noting that under the "prevailing view," the "entry of default prevents the defendant from disputing the truth of well-pleaded facts in the complaint pertaining to liability").

Tropikgadget FZE is a foreign entity incorporated in the United Arab Emirates, with a principal place of business in Lisbon, Portugal. (Compl. ¶ 13.) Tropikgadget FZE holds the rights to "Wings Network" marketing and brand services, which includes but is not limited to, the names Wings Network, Wingsnetwork, and WingsNetwork.Com (collectively "Wings Network"). (Id.) Tropikgadget Unipessoal LDA is a foreign entity incorporated in the Madeira

Free Trade Zone, with a principal place of business in Lisbon, Portugal. (Id. ¶ 12.) Neither Tropikgadget entity has ever been registered with the Securities and Exchange Commission, nor has either entity ever registered any offering of securities under the Securities Act or any class of securities under the Exchange Act.

The Complaint alleges that Tropikgadget, acting primarily through defendants Tanaka, Barbosa, and Campos,[2] operated a fraudulent pyramid scheme under the "Wings Network" name. Tropikgadget began operating in the United States as early as November 7, 2013, and quickly built a distribution network of associates or "members." (Id. ¶ 35). Defendants presented Wings Network as a "multi-level marketing" company in the business of providing digital and mobile solutions, such as games, apps, cloud storage, and marketing tools. (Id. ¶ 36). In actuality, however, Tropikgadget generated little to no revenue from the sale of such products or services. (Id. ¶ 37). Instead, Tropikgadget's revenues were generated through sales of its "membership packs," which promised members guaranteed monthly returns in exchange for becoming a promoter of Wings Network. (Id. ¶¶ 57-60).

Wings Network charged a $49 membership fee to its members. (Id. ¶ 54). Wings Network's promotional materials represented that paying this membership fee qualified the member to receive a "sales bonus" equal to 25% of future Wings Network total sales. (Id.). The initial $49 fee, however, did not entitle the member to participate in Wings Network's compensation plan. (Id.). Rather, to participate in the compensation plan, the member had to invest in one of three "membership packs," ranging in price from $299 to $1,499. (Id. ¶ 55). Each pack came with an increasing number of "points," that could purportedly be exchanged for

---

[2] Tanaka was the founder of Wings Network and served as president of the Wings Network Board of Directors. (Compl. ¶¶ 14, 35). Barbosa is the chief executive officer of Wings Network. (Id. ¶ 15). Campos is the Director of Operations of Wings Network. (Id. ¶ 16).

compensation, as well as a number of tools that the member could use for further promotion of Wings Network, such as "landing pages," "banners," Facebook ads, and cloud storage. (Id.). None of the membership packs, however, provided any mechanism for the member to sell the digital and mobile products and services allegedly offered by Wings Network. (Id. ¶ 56).  In Wings Network's marketing materials, defendants promised that those who purchased "membership packs" would receive monetary returns for their investments and for their successful recruitment of additional members. (Id. ¶ 57).

Specifically, Wings Network had eight bonus plans for members who recruited new investors. (Id. ¶ 58). Only one of those eight plans – the "sales bonus" plan – had any relationship to the sale of an actual product or service. (Id.). Wings Network, however, never made any payments to any member based upon the "sales bonus" plan. (Id.). Rather, members were paid according to a system of "points," based on (1) the number of additional members the member recruited; (2) the number of additional members recruited by those members that the member recruited; (3) the number of total membership products sold throughout Wings Network; and (4) the price level of the membership packs purchased. (Id.).Wings Network's revenues derived solely from selling membership packs, and Wings Network's records reflect no revenue from sales of actual products or services. (Id. ¶ 64).

Between November 2013 and April 2014, Tropikgadget and its principals, operating through Wings Network, raised at least $23.5 million from thousands of investors throughout the United States, many of whom were members of the Brazilian and Dominican immigrant communities (Id. ¶ 1). Investors were initially recruited through a website and online webinar presentations conducted by defendants Barbosa and Campos. (Id. ¶ 48). After establishing a network of lead promoters, the Wings Network grew rapidly, as members recruited additional

investors through face-to-face contact, as well as through social media. (Id. ¶ 49). The principal defendants and other Wings Network promoters hosted live events at hotels and other locations throughout the United States, where they presented the Wings Network "business opportunity" to potential new members. (Id. ¶¶ 50-51).

The Complaint further alleges that Tropikgadget, through the individual defendants, made a number of fraudulent and misleading statements in connection with its recruitment of new investors. For example, during presentations to potential investors, Barbosa and at least one other promoter for Wings Network showed potential investors copies of what they claimed was Wings Network's application to join the "Direct Selling Association" ("DSA"). (Id. ¶ 66). The DSA is a national trade association of approximately 200 multilevel marketing companies, which promotes the interests of its members and maintains a Code of Ethics as a condition of membership. (Id.). Companies are admitted to the DSA only after a vetting period. (Id. ¶ 67). Wings Network's principals falsely claimed that the company had successfully passed a "pre-analysis" or "pre-screening" process for the DSA, including a preliminary review of the sustainability and legality of the company. (Id.  ¶ 68). In actuality, however, the DSA does not have a pre-analysis or pre-screening process, and the DSA's records do not reflect any application for membership or membership in the name of Wings Network. (Id. ¶ 70). In fact, the DSA sent Wings Network a cease and desist letter in April 2014, requesting that Wings Network cease its claims of affiliation with DSA. (Id. ¶ 72).

Other Wings Network promoters falsely represented to prospective investors that their initial investments in the "Member Packs" would be 100% guaranteed through an insurance policy. (Id. ¶ 73). Barbosa and Campos also represented that investors could receive full refunds if they cancelled their investment within fourteen days of signing up as members. (Id. ¶ 74).

Investors, however, reported that Wings Network failed to provide such refunds, even after multiple requests. (Id.).

The Complaint alleges that Tropikgadget received Wings Network investors' funds, and made limited payouts to investors, through Tropikgadget Unipessoal LDA's bank accounts. (Id. ¶ 12). But while Barbosa, Campos, and several other Wings Network promoters promised payments to investors in exchange for their recruitment of new members, many investors never received any such payments. (Id. ¶ 75). According to the Wings Network compensation plan, Wings Network members earned "points" that could be redeemed for cash commissions. (Id.). But many investors who attempted to redeem their points were unable to withdraw any money. (Id.). Barbosa and Campos also promised members that they would be able to withdraw their money utilizing a "Wings Card," which would enable transfers from the member's Wings Network account to a debit card. Many investors, however, never received a Wings Card, and most of those who did receive cards found that the cards did not work as promised. (Id. ¶ 77).

Tropikgadget voluntarily suspended its U.S. operations in May 2014, after the Massachusetts Securities Division filed an Administrative Complaint alleging that the Wings Network was operating a fraudulent pyramid scheme. (Id. ¶ 13). The SEC further alleges that also in May 2014, certain relief defendants, including Compasswinner and Happy, received wire transfers from Tropikgadget, consisting of the illicit proceeds of Tropikgadget's pyramid scheme.[3] On May 8, 2014, Compasswinner received a wire transfer of approximately $8.7 million from Tropikgadget. (Id. ¶ 30). On May 12, 2014, Happy received a wire transfer from Tropikgadget in the amount of approximately $1.18 million. (Id.).

---

[3] Compasswinner and Happy are Portugal corporations with principal places of business in Portugal. On June 19, 2014, Happy became the parent company of Tropikgadget Unipessoal LDA, and its registration identifies Tanaka and Barbosa as Happy's company officers. (Id. ¶ 31).

## IV.    DISCUSSION

### A.  Liability of Tropikgadget

The SEC's Complaint asserts six claims for relief against the Tropikgadget entities.

Counts I and II allege that Tropikgadget violated Section 10(b) of the Exchange Act, 15 U.S.C. §

78j(b), and Rules 10b-5(a), (b), and (c) thereunder. See 17 C.F.R. § 240.10b-5(a), (b), & (c).

These provisions prohibit any person, in connection with the purchase or sale of any security,

from, directly or indirectly: 1) employing any device, scheme or artifice to defraud; (2) making

any untrue statement of material fact or omitting to state a material fact necessary in order to

make the statements made, in light of the circumstances under which they were made, not

misleading; or (3) engaging in any transaction, practice or course of business that operates or

would operate as a fraud or deceit upon any person. See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-

5.

Counts III, IV, and V allege that Tropikgadget violated Sections 17(a)(1), (2), and (3) of

the Securities Act, 15 U.S.C. § 77q(a)(1), (2), & (3). Section 17(a) prohibits, in the offer or sale

of securities: (1) employing devices, schemes or artifices to defraud; (2) obtaining money or

property by means of materially false or misleading statements; and (3) engaging in transactions,

practices or courses of business that operate as a fraud or deceit. See 15 U.S.C. § 77q(a).

Count VI further alleges that Tropikgadget violated Section 5(a) and 5(c) of the

Securities Act, 15 U.S.C. § 77e(a) & (c). Section 5(a) provides that, unless a registration

statement is in effect, it is unlawful for any person, directly or indirectly, to sell securities

through the use of any means or instruments of interstate commerce. 15 U.S.C. § 77e(a). Section

5(c) provides for a similar prohibition against offers to sell, or offers to buy, unless a registration

statement has been filed. 15 U.S.C. § 77e(c).

After reviewing the facts alleged in the Complaint, the Court finds that they sufficiently support the claims alleged against Tropikgadget in Counts I through VI.

As a threshold matter, the SEC has adequately alleged, for purposes of a default judgment, that Tropikgadget was engaged in the sale or offering for sale of "securities," as that term is defined in the Securities Act and the Exchange Act. Both statutes define "security" to include "investment contracts." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). Under the three-part test established by the Supreme Court in SEC v. W.J. Howey Co., 328 U.S. 293 (1946), an investment contract comprises "(1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party." S.E.C. v. SG Ltd., 265 F.3d 42, 46 (1st Cir. 2001) (citing Howey, 328 U.S. at 298-99). "This formulation," however, "must be applied in light of the economic realities of the transaction," id., and the courts have adopted a "broad construction" of what may constitute an investment contract, "aspiring 'to afford the investing public a full measure of protection.'" Id. (quoting Howey, 328 U.S. at 298). Here, under the facts alleged in the Complaint, Tropikgadget's sale of "membership packs" to prospective members constitutes an investment contract. In Tropikgadget's marketing materials for Wings Network, the defendants promised that those who purchased "membership packs" would receive monetary returns on their investments, contingent on the successful recruitment of additional members. (Compl. ¶ 57). The First Circuit has held that such promises satisfy the "commonality" element of the Howey test. See SG Ltd., 265 F.3d at 51 (noting that Ponzi schemes "typically satisfy the horizontal commonality standard").

The SEC has also alleged sufficient facts to make out a *prima facie* case that Tropikgadget violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. The Complaint is replete with allegations that Tropikgadget, through

its principals and promoters, made numerous false and misleading statements to investors and

potential investors in connection with its promotion of Wings Network. Moreover, many of these

statements are alleged to be material, insofar as there is a "substantial likelihood that the

disclosure of the omitted fact would have been viewed by the reasonable investor as having

significantly altered the 'total mix' of information made available." Matrixx Initiatives, Inc. v.

Siracusano, 563 U.S. 27, 131 S. Ct. 1309, 1318 (2011) (quoting Basic Inc. v. Levinson, 485 U.S.

224, 231-32 (1988)). Further, these misstatements were made in the context of Tropikgadget's

overarching scheme to generate income by inducing investors to purchase membership packs in

Wings Network, and encouraging them to solicit further investments from new members, in

return for a future payout. These facts suggest that Tropikgadget was operating a scheme to

defraud its investors.

The SEC has also adequately alleged that Tropikgadget, through its principals, acted with

scienter, as required to state a claim under Section 17(a)(1) of the Securities Act, and Section

10(b) of the Exchange Act and Rule 10b-5 thereunder. See S.E.C. v. Ficken, 546 F.3d 45, 47 (1st

Cir. 2008) ("Proof of scienter is required to establish violations of § 17(a)(1), § 10(b), or Rule

10b–5 . . . .").[4] Scienter may be established by indirect evidence, and "may extend to a form of

extreme recklessness . . . ." In re Cabletron Sys., Inc., 311 F.3d 11, 38 (1st Cir. 2002). Although

a corporate entity is not capable of intent, "the knowledge obtained by corporate employees

acting within the scope of their employment is imputed to the corporation," United States v.

Bank of New England, N.A., 821 F.2d 844, 856 (1st Cir. 1987), and "the scienter of executives

can be imputed to corporate entities" for purposes of claims arising under the federal securities

---

[4] Scienter is not required to state a claim under Sections 17(a)(2) and 17(a)(3) of the Securities
Act; mere negligence is sufficient to establish liability. See Ficken, 546 F.3d at 47.

laws. <u>S.E.C. v. Treadway</u>, 430 F. Supp. 2d 293, 337 (S.D.N.Y. 2006). The nature of Tropikgadget's misstatements to investors was to present Wings Network as a legitimate multi-level marketing company offering actual products and services, and to conceal the fact that the company had no legitimate revenue stream and was operating as a classic pyramid scheme. The content of Tropikgadget's alleged misstatements, and the context in which they were made, support the required element of scienter.

Finally, the SEC's Complaint adequately alleges facts suggesting that Tropikgadget was engaged in the unregistered sale and offering of securities, in violation of Section 5(a) and 5(c) of the Securities Act. A *prima facie* case for a violation of Sections 5(a) and 5(c) requires a showing that: (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly offered to sell the securities; and (3) the offer or sales were made in connection with the use of interstate transportation, communication, or the mails. <u>See</u> <u>SEC v. Spence & Green Chem. Co.</u>, 612 F.2d 896, 901-02 (5th Cir. 1980). Each of these elements is adequately alleged in the SEC's Complaint. (<u>See, e.g.</u>, Compl. ¶¶ 13-16, 43-44, 54-60).

In sum, the SEC has alleged sufficient facts to support the claims alleged against Tropikgadget in Counts I through VI of the Complaint. Because Tropikgadget has defaulted, its liability is therefore established on Counts I through VI.

### B.  Liability of Relief Defendants Happy and Compasswinner

In Count VII of the Complaint, the SEC asserts a claim for unjust enrichment against Happy, Compasswinner, and other relief defendants. In a case arising under the federal securities laws, "[a] court can obtain equitable relief from a non-party against whom no wrongdoing is alleged if it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them." <u>S.E.C. v. Cherif</u>, 933 F.2d 403, 414 n. 11 (7th Cir. 1991); <u>see also</u>

S.E.C. v. Pinez, 989 F. Supp. 325, 337 (D. Mass. 1997). As to Happy and Compasswinner, the SEC has alleged facts sufficient to state a claim for equitable relief.

The Complaint alleges that in May 2014, around the time that the Massachusetts Securities Division filed an administrative complaint, and Tropikgadget voluntarily suspended its operations, Tropikgadget made two large wire transfers – one to Happy on May 12, 2014, in the amount of approximately $1.8 million, and another to Compasswinner on May 8, 2014, in the amount of approximately $8.7 million. (See Compl. ¶¶ 13, 30-31). Happy is alleged to be the parent company of Tropikgadget Unipessoal LDA, and its registration identifies Tanaka and Barbosa as corporate officers. (Id. ¶ 31). The Court is aware of no evidence that these relief defendants provided Tropikgadget with any goods or services for the amounts received (see ECF No. 166), and the SEC has alleged that the relief defendants have no legitimate interest in, or right to, the funds that they received from Tropikgadget, and that these funds are the proceeds of Tropikgadget's illegal pyramid scheme. (Compl. ¶ 97). Therefore, the SEC may obtain equitable relief from Happy and Compasswinner.

### C.  Disgorgement

In light of the Portuguese defendants' default, the SEC has requested that the Court enter an Order of Disgorgement and Prejudgment Interest. In a case involving violation of the federal securities laws, the Court has "'broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged.'" S.E.C. v. Druffner, 802 F. Supp. 2d 293, 297 (D. Mass. 2011) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474-75 (2d Cir. 1996)). The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation," S.E.C. v. Happ, 392 F.3d 12, 31 (1st Cir. 2004) (internal quotations and citation omitted), and the "risk of uncertainty in calculating

disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." Id.

After reviewing the Declaration of John McCann, the SEC's forensic accountant, the Court finds that the disgorgement amounts requested by the SEC represent a reasonable approximation of the profits causally connected to the illegal conduct alleged in the Complaint. In order to estimate the appropriate disgorgement figure in this case, Mr. McCann reviewed documents and bank records produced to the SEC, concerning Tropikgadget Unipessoal LDA's bank account at Millenium BCP in Portugal. (McCann Decl. ¶ 4). Those documents included monthly statements and supporting records for individual transactions greater than or equal to €1000, for Tropikgadget Unipessoal LDA's account # ending in **84-05. (Id. ¶¶ 4-5). The bank records Mr. McCann reviewed covered the period from November 2013 (when the account was opened), through June 2014 (shortly after Tropikgadget ceased its operations). (Id. ¶ 5). Mr. McCann concluded that Tropikgadget Unipessoal LDA's, Compasswinner's, and Happy's profits subject to disgorgement were €14,600,747; €7,000,000; and €950,000, respectively. Those amounts were calculated as follows:

With respect to Tropikgadget Unipessoal LDA, Mr. McCann determined that the company's deposit/credit transactions from November 2013 through May 2014 were approximately €22,184,469. (Id. ¶ 7). €7,000,000 of those deposits, however, related to the maturity of two term deposits previously purchased from the available balance in the account. Mr. McCann determined that these term deposits did not appear to be related to any investor activity of Wings Network, and they were therefore excluded from the disgorgement number. (Id.). Mr. McCann also reviewed the withdrawal/debit transactions from November 2013 through May 2014, and found that they approximated €16,515,604. After examining these withdrawals in detail, Mr. McCann determined that included in these withdrawals was approximately €583,722

that likely related to investor refunds and/or returns, which amounts were also excluded from the disgorgement total. (Id. ¶ 8). Tropikgadget Unipessoal LDA's total profits subject to disgorgement were calculated by subtracting the €7,000,000 in non-investor term deposit maturities, and the €583,722 in likely investor refunds, from the €22,184,469 in total reported deposits/credits in the account over the relevant time period, leaving €14,600,747 in total estimated profits. (Id. ¶ 9).[5] Next, Mr. McCann calculated the disgorgement amounts for Compasswinner and Happy based on the amounts of Tropikgadget's wire transfers to these entities, which were €7,000,000 and €950,000, respectively (Id. ¶¶ 11-13).

Mr. McCann then calculated the amount of prejudgment interest on the disgorgement amounts, from June 1, 2014 (the end of the Wings Network scheme), through August 31, 2015,[6] using the rate proposed by the SEC, which is the same rate applied by the Internal Revenue Service when calculating underpayment penalties (Id. ¶ 12); see also SEC v. Druffner, 517 F. Supp. 2d 502, 512 (D. Mass. 2007). Finally, Mr. McCann converted the disgorgement and prejudgment interest amounts from Euros to United States Dollars, using the conversion rate as of August 31, 2015. These calculations produced a final disgorgement figure of $16,947,786 for Tropikgadget Unipessoal LDA; $8,125,235 for Compasswinner; and $1,102,711 for Happy. (Id.

---

[5] Mr. McCann was not able to acquire supporting documents for approximately 1,300 withdrawals/debits from the Tropikgadget account that were less than €1000. Those withdrawals totaled approximately €80,552 during the relevant time period. Mr. McCann thought that a significant number of these charges may have related to bank charges, fees, and taxes, but noted that he was unable to identify whether those transactions could also represent investor refunds/returns. Therefore, he made no allowance in his calculation of the disgorgement amount for these debits.

[6] Clerk's Notices of Default entered against the Portuguese defendants on September 1, 2015. [ECF Nos. 152, 153, 154, 155].

¶ 13).

The Court finds no error in these calculations and concludes that the SEC's proposed disgorgement amounts represent a reasonable calculation of the profits causally connected to the defendants' violations. Therefore, the Court will order that Tropikgadget FZE and Tropikgadget Unipessoal LDA are jointly and severally liable for a total disgorgement amount, together with prejudgment interest, of $26,175,732, of which $8,125,235 is joint and several with Compasswinner, and of which $1,102,711 is joint and several with Happy.

### D.  Civil Penalties

The SEC further argues that the Court should impose separate civil penalties upon both Tropikgadget entities pursuant to Section 20(d)(2) of the Securities Act, 15 U.S.C. § 77t(d)(2), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(i). The amount of the penalty should be "determined by the court in light of the facts and circumstances." 15 U.S.C. § 78u(d)(3)(B)(i). The statutes establish a "three-tier system" for civil penalties, with "third-tier penalties available for individuals and entities that violate the securities laws in a manner that involves 'fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and . . . directly or indirectly resulted in a substantial loss or created a significant risk of substantial losses to other persons.'" SEC v. Spencer Pharma., Inc., No. 12-cv-12334-IT, 2015 WL 5749436, at *7 (D. Mass. Sept. 30, 2015) (quoting 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii)). Here, the allegations in the Complaint establish that Tropikgadget, through its principals, conducted a large-scale pyramid scheme that defrauded thousands of investors, and generated more than $20 million in ill-gotten proceeds over a seven-month period. Accordingly, the Court finds that third-tier penalties are warranted. For entities such as Tropikgadget FZE and Tropikgadget Unipessoal LDA, the maximum third-tier civil penalty available is the greater of

$775,000, or the gross pecuniary gain to the defendant. <u>See</u> 15 U.S.C. § 77t(d)(2)(C); 78u(d)(3)(B)(iii); 17 C.F.R. § 201.1005 & Tbl. V (adjusting amounts in statute for inflation, and providing that adjusted third-tier maximum penalty is now $775,000 for all violations occurring after March 5, 2013). The SEC has requested civil penalties in the amount of $725,000 against each of the Tropikgadget entities. The Court finds these amounts to be appropriate.

### E.  Permanent Injunction

The SEC has also requested that the Court enter a permanent injunction enjoining Tropikgadget FZE and Tropikgadget Unipessoal LDA from committing further violations of the federal securities laws. <u>See</u> 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1). "An injunction is appropriate if the Court determines there is a reasonable likelihood that the defendant will violate the laws again in the future." <u>Druffner</u>, 517 F. Supp. 2d at 513 (citation omitted). To determine whether the defendant is reasonably likely to violate the laws again in the future, the Court looks to "whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future." <u>Id.</u> (quoting <u>SEC v. </u>Bilzerian, 29 F.3d 689, 695 (D.C. Cir. 1994)). In light of the allegations in the Complaint, which describe an elaborate, deliberate, and prolonged scheme to defraud thousands of investors, the Court finds that a permanent injunction is warranted.

For the foregoing reasons, the SEC's Motion for Default Judgment against the Portuguese defendants [ECF No. 165] is <u>ALLOWED</u>.

**SO ORDERED.**

Dated: November 12, 2015

/s/ Allison D. Burroughs
_____
Allison D. Burroughs
UNITED STATES DISTRICT JUDGE