UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 15-cv-10543-ADB |
| TROPIKGADGET FZE., et al., | * * | |
| Defendants. | * * | |
| and | * * | |
| UNIVEST FINANCIAL SERVICES CORP., et al., | * * * | |
| Relief Defendants | * | |

**MEMORANDUM AND ORDER ON MOTIONS FOR DEFAULT JUDGMENT AGAINST DEFENDANTS VIVIANE RODRIGUES AND WESLEY RODRIGUES**

**I.   INTRODUCTION**

In February 2015, Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") filed this civil enforcement action against three companies, fifteen individual defendants, and several relief defendants. This case arises out of an alleged pyramid scheme operated by defendants Tropikgadget FZE and Tropikgadget Unipessoal LDA (collectively, "Tropikgadget"), through their principals, defendants Sergio Henrique Tanaka ("Tanaka"), Carlos Luis da Silveira Barbosa ("Barbosa"), and Claudio de Oliveira Pereira Campos ("Campos"). In addition to the Tropikgadget entities and their principals, the SEC named as defendants twelve alleged "promoters" of the pyramid scheme, including Defendants Wesley Brandao Rodrigues ("Wesley Rodrigues"), and Viviane Amaral Rodrigues ("Viviane

Rodrigues"), (together, the "Defaulting Promoters").[1] The Commission alleges that between November 2013 and April 2014, Tropikgadget, through the actions of its principals and promoters, raised at least $23.5 million from thousands of investors through a fraudulent and unregistered offering of securities. The securities took the form of membership packs that promised guaranteed monthly returns in exchange for "promoting" the business. The Commission's Complaint alleges that each of the defendants sold and offered for sale unregistered securities, in violation of Section 5 of the Securities Act of 1933.

The Commission served a summons and Complaint on Defendant Viviane Rodrigues on February 27, 2015. [ECF No. 23]. She filed an Answer on March 23, 2015. [ECF No. 64]. Subsequently, however, Ms. Rodrigues repeatedly failed to appear for properly-noticed depositions, failed to respond to written discovery, and failed to respond to the Court's October 7, 2015 Order to Show Cause. See [ECF No. 188]. As a result, the Court ordered the Clerk to enter a default as to Viviane Rodrigues. Id. On December 1, 2015, the Clerk entered a Notice of Default pursuant to Fed. R. Civ. P. 55(a). [ECF No. 190].

Similarly, the Commission served a summons and Complaint on Defendant Wesley Rodrigues on March 4, 2015. [ECF No. 32]. Although he never formally answered the Complaint, Mr. Rodrigues appeared *pro se* at certain court hearings in this case. [ECF Nos. 93, 137, 143]. In October, 2015, however, Wesley Rodrigues ceased responding to communications from the Commission, and the Commission moved for a default. [ECF No. 177]. The Court issued an Order to Show Cause, to which Mr. Rodrigues did not respond. [ECF No. 178]. Consequently, the Court also ordered the Clerk to enter a default as to Wesley Rodrigues. [ECF No. 188]. On December 1, 2015, the Clerk entered a Notice of Default pursuant to Fed. R. Civ.

---

[1] The Commission represents that it is not aware of any relation between the two defendants.

P. 55(a). [ECF No. 191].

Currently before the Court is the Commission's Motion for a Default Judgment against Wesley Rodrigues and Viviane Rodrigues [ECF No. 215], which is supported by a Memorandum of Law [ECF No. 216], and the Sixth Declaration of John McCann [ECF No. 215-1]. After an August 8, 2016 hearing, the Court requested further information from the Commission regarding the calculation of disgorgement amounts against both Defaulting Promoters. Subsequently, the Commission submitted a Supplemental Motion for Default Judgment [ECF No. 254], which was supported by the Ninth Declaration of John McCann. [ECF No. 254-1].

For the reasons set forth in this Memorandum and Order, the SEC's Motions for Default Judgment are ALLOWED as to Defendants Wesley Rodrigues and Viviane Rodrigues.

## II.   LEGAL STANDARD

As set forth in Fed. R. Civ. P. 55(b), "a plaintiff 'must apply to the court for a default judgment' where the amount of damages claimed is not a sum certain." Vazquez-Baldonado v. Domenech, 792 F. Supp. 2d 218, 221 (D.P.R. 2011) (quoting Fed. R. Civ. P. 55(b)). As to the issue of liability, the entry of default "constitutes an admission of all facts well-pleaded in the complaint . . . ." Id. (internal quotations and citations omitted). Because both Wesley Rodrigues and Viviane Rodrigues have been defaulted in this case, they are "taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability." In re The Home Restaurants, Inc., 285 F.3d 111, 114 (1st Cir. 2002). On a motion for a default judgment, however, it is appropriate to independently "examine a plaintiff's complaint, taking all well-pleaded factual allegations as true, to determine whether it alleges a cause of action." Ramos-Falcon v. Autoridad de Energia Electrica, 301 F.3d 1, 2 (1st Cir. 2002). Assuming that the facts alleged state a viable cause of action, the defaulting defendant's liability will be

established.

With regard to damages, Fed. R. Civ. P. 55(b)(2) provides that the court "may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." A hearing, however, is not necessarily required, particularly where the facts alleged in the pleadings, together with affidavits submitted by the moving party, establish the amount of the default judgment. See In re The Home Restaurants, Inc., 285 F.3d at 114 (holding that district court did not abuse its discretion by entering default judgment without first holding evidentiary hearing, where there was "no uncertainty about the amounts at issue," the pleadings contained "specific dollar figures," and the court requested and received affidavits in support of the default judgment).

The Commission argues that the facts alleged in the Complaint establish that the Defaulting Promoters violated federal securities laws by selling and offering to sell unregistered securities in interstate commerce. The Commission further argues that these facts warrant a permanent injunction against the Defaulting Promoters, as well as disgorgement of their ill-gotten gains, together with prejudgment interest. In addition, the SEC seeks a civil monetary penalty of $7,500 against both defendants. In this Memorandum and Order, the Court will address the adequacy of the Complaint for purposes of establishing liability, as well as the remedies requested by the SEC.

### III.   SUMMARY OF RELEVANT FACTS

The salient facts alleged in the SEC's Complaint, [ECF No. 1] ("Compl.")), are summarized below. The Court accepts these facts as true for purposes of these Motions. See Conetta v. Nat'l Hair Care Centers, Inc., 236 F.3d 67, 76 (1st Cir. 2001) (noting that under the

"prevailing view," the "entry of default prevents the defendant from disputing the truth of well-pleaded facts in the complaint pertaining to liability").

## A. Relevant Defendants

Tropikgadget FZE is a foreign entity incorporated in the United Arab Emirates, with a principal place of business in Lisbon, Portugal. Compl. ¶ 13. Tropikgadget FZE holds the rights to "Wings Network" marketing and brand services, which includes but is not limited to, the names Wings Network, Wingsnetwork, and WingsNetwork.Com (collectively "Wings Network"). Id. Tropikgadget Unipessoal LDA is a foreign entity incorporated in the Madeira Free Trade Zone, with a principal place of business in Lisbon, Portugal. Id. ¶ 12. Neither Tropikgadget entity has ever been registered with the Securities and Exchange Commission, nor has either entity ever registered any offering of securities under the Securities Act or any class of securities under the Exchange Act. Id. ¶ 13.

Wesley Rodrigues, age 28, of Marlborough, Massachusetts, was a promoter of Wings Network. Id. ¶ 21. According to the February 2014 Wings Network "Connect" magazine published on the Wings Network website, Wesley Rodrigues achieved the rank of Senior Manager, indicating that he had accumulated at least $1.5 million from investors. Id. According to Tropikgadget records, Wesley Rodrigues generated commissions of $791,745 from the sale of Wings Network membership packages. Id. He conducted his Wings Network activities through Cawboy Services, Inc. ("Cawboy"), a Massachusetts corporation. Id. Further, he appeared in a promotional video for Wings Network that he posted on the internet; traveled to several states including California and Utah during 2014 to present at Wings Network promotional events; owned and operated a Wings Network branded car through Cawboy; and promoted Wings Network on social media and his Wings Recruiter page, which was hosted on the Wings

Network website. Id.

Viviane Rodrigues, age 27, of Clinton, Massachusetts, was also a promoter of Wings Network. Id. ¶ 25. According to the April 2014 Wings Network "Connect" magazine, Viviane Rodrigues achieved the Director level, indicating that she had accumulated at least $6 million from investors. Id. According to Tropikgadget records, Viviane Rodrigues generated commissions of at least $434,150 from the sale of Wings Network membership packs. Id. She appeared in many promotional videos and online conferences for Wings Network on the internet; traveled to several states including Florida and Pennsylvania during 2014 to present at Wings Network promotional events; and promoted Wings Network through social media. Id.

### B. Wings Network operations

The Complaint alleges that Tropikgadget, acting primarily through defendants Tanaka, Barbosa, and Campos,[2] operated a fraudulent pyramid scheme under the "Wings Network" name. Tropikgadget began operating in the United States on or about November 7, 2013, and quickly built a distribution network of associates or "members." Id. ¶ 35. Defendants presented the Wings Network as a "multi-level marketing" company in the business of providing digital and mobile solutions, such as games, apps, cloud storage, and marketing tools. Id. ¶ 36. In actuality, however, Tropikgadget generated little to no revenue from the sale of such products or services. Id. ¶ 37. Instead, Tropikgadget's revenues were generated through sales of its "membership packs," which promised members guaranteed monthly returns in exchange for becoming a promoter of the Wings Network. Id. ¶¶ 57-60.

The Wings Network charged a $49 membership fee to its members. Id. ¶ 54. Wings

---

[2] Tanaka was the founder of Wings Network and served as president of the Wings Network Board of Directors. Compl. ¶¶ 14, 35. Barbosa is the chief executive officer of Wings Network. Id. ¶ 15. Campos is the Director of Operations of Wings Network. Id. ¶ 16.

Network's promotional materials represented that paying this membership fee qualified the member to receive a "sales bonus" equal to 25% of future Wings Network total sales. Id. The initial $49 fee, however, did not entitle the member to participate in Wings Network's compensation plan. Id. Rather, to participate in the compensation plan, the member had to invest in one of three "membership packs," ranging in price from $299 to $1,499. Id. ¶ 55. Each pack came with an increasing number of "points," that could purportedly be exchanged for compensation, as well as a number of tools that the member could use for further promotion of Wings Network, such as "landing pages," "banners," Facebook ads, and cloud storage. Id. None of the membership packs, however, provided any mechanism for the member to sell the digital and mobile products and services allegedly offered by Wings Network. Id. ¶ 56.

The Wings Network's marketing materials promised that those who purchased "membership packs" would receive monetary returns for their investments and for their successful recruitment of additional members. Id. ¶ 57. Additionally, Vivian Rodrigues represented to prospective investors that if they purchased the "Elite Pack" and sold two additional Elite Packs to new members, they would receive a monthly Consultant Bonus of $750. Id. ¶ 63.

The Wings Network had eight bonus plans for members who recruited new investors. Id. ¶ 58. Only one of those eight plans – the "sales bonus" plan – had any relationship to the sale of an actual product or service. Id. Wings Network, however, never made any payments to any member based upon the "sales bonus" plan. Id. Instead, members were paid according to a system of "points," based on (1) the number of additional members he or she recruited; (2) the number of additional members recruited by those members that the member recruited; (3) the number of total membership products sold throughout Wings Network; and (4) the price level of

the membership packs purchased. Id. Wings Network's revenues derived solely from selling membership packs, and Wings Network's records reflect no revenue from sales of actual products or services. Id. ¶ 64.

Between November 2013 and April 2014, Tropikgadget and its principals, operating through the Wings Network, raised at least $23.5 million from thousands of investors throughout the United States, many of whom were members of the Brazilian and Dominican immigrant communities. Id. ¶ 1. Investors were initially recruited through a website and online webinar presentations conducted by Defendants Barbosa and Campos. Id. ¶ 48. After establishing a network of lead promoters, the Wings Network grew rapidly, as members recruited additional investors through face-to-face contact, as well as through social media. Id. ¶ 49. The principal defendants and other Wings Network promoters hosted live events at hotels and other locations throughout the United States, where they presented the Wings Network "business opportunity" to potential new members. Id. ¶¶ 50-51.

In early April 2014, Wings Network held a "USA Launch" party, which included Wesley Rodrigues and Viviane Rodrigues as speakers. Id. ¶ 53. During this event, each of the promoter defendants received awards as promoters who had achieved certain milestones, and they thanked the Wings Network, its principals, and other high-level promoters for changing their lives and helping them to achieve their dreams. Id.

The Complaint further alleges that Tropikgadget, through the individual defendants, made a number of fraudulent and misleading statements in connection with its recruitment of new investors. For example, Viviane Rodrigues represented to prospective investors that their initial investments in the "Member Packs" would be 100% guaranteed through an insurance policy. Id. ¶ 73.

Tropikgadget received Wings Network investors' funds, and made limited payouts to investors, through Tropikgadget Unipessoal LDA's bank accounts. Id. ¶ 12. But while Barbosa, Campos, and several other Wings Network promoters promised payments to investors in exchange for their recruitment of new members, many investors never received any such payments. Id. ¶ 75. According to the Wings Network compensation plan, Wings Network members earned "points" that could be redeemed for cash commissions. Id. But many investors who attempted to redeem their points were unable to withdraw any money. Id. Barbosa and Campos also promised members that they would be able to withdraw their money utilizing a "Wings Card," which would enable transfers from the member's Wings Network account to a debit card. Many investors, however, never received a Wings Card, and most of those who did receive cards found that the cards did not work as promised. Id. ¶ 77.

Tropikgadget voluntarily suspended its U.S. operations in May 2014, after the Massachusetts Securities Division filed an Administrative Complaint alleging that the Wings Network was operating a fraudulent pyramid scheme. Id. ¶ 13.

## IV. DISCUSSION

### A. Liability under Section 5 of the Securities Act

Count VI of the Commission's Complaint alleges that all defendants, including Wesley Rodrigues and Viviane Rodrigues, violated Section 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. § 77e(a) & (c). Section 5(a) provides that, unless a registration statement is in effect, it is unlawful for any person, directly or indirectly, to sell securities through the use of any means or instruments of interstate commerce. 15 U.S.C. § 77e(a). Section 5(c) provides for a similar prohibition against offers to sell, or offers to buy, unless a registration statement has been filed. 15 U.S.C. § 77e(c).

A *prima facie* case for a violation of Sections 5(a) and 5(c) requires a showing that: (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly offered to sell the securities; and (3) the offer or sales were made in connection with the use of interstate transportation, communication, or the mails. See SEC v. Spence & Green Chem. Co., 612 F.2d 896, 901-02 (5th Cir. 1980).

After reviewing the facts alleged in the Complaint, the Court finds that they sufficiently support the claims alleged in Count VI. See, e.g., Compl. ¶¶ 13-16, 21, 25, 53, 58, 63, 73. First, the Complaint alleges that Tropikgadget and its promoters were engaged in the sale or offering for sale of "securities," as that term is defined in the Securities Act. The statute defines "security" to include "investment contracts." 15 U.S.C. § 77b(a)(1). Under the three-part test established by the Supreme Court in SEC v. W.J. Howey Co., 328 U.S. 293 (1946), an investment contract comprises "(1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party." S.E.C. v. SG Ltd., 265 F.3d 42, 46 (1st Cir. 2001) (citing Howey, 328 U.S. at 298-99). "This formulation," however, "must be applied in light of the economic realities of the transaction," id., and the courts have adopted a "broad construction" of what may constitute an investment contract, "aspiring 'to afford the investing public a full measure of protection.'" Id. at 47 (quoting Howey, 328 U.S. at 298).

Here, under the facts alleged in the Complaint, the defendants' sale of "membership packs" to prospective members constitutes an investment contract. The marketing materials for the Wings Network promised that those who purchased "membership packs" would receive monetary returns on their investments, contingent on the successful recruitment of additional members. Compl. ¶ 57. The First Circuit has held that such promises satisfy the "commonality"

element of the Howey test. See SG Ltd., 265 F.3d at 51 (noting that Ponzi schemes "typically satisfy the horizontal commonality standard").

The Complaint also adequately alleges that Wesley Rodrigues and Viviane Rodrigues personally engaged in these unregistered sales and offerings of securities, in violation of Section 5(a) and 5(c) of the Securities Act. Both defendants actively promoted the Wings Network and its membership packs by speaking at promotional conferences, appearing in promotional videos and online conferences, and posting promotional material on social media. Compl. ¶¶ 21, 25. According to Tropikgadget records, Wesley Rodrigues generated commissions of $791,745, and Viviane Rodrigues generated commissions of at least $434,150, from the sale of Wings Network membership packages. Id.

Finally, the Complaint adequately alleges that these sales and offerings were made in connection with the use of interstate transportation, communication, or the mails. Id. ¶¶ 10, 21, 25. Thus, the Commission has established that Wesley Rodrigues and Viviane Rodrigues violated Section 5(a) and 5(c) of the Securities Act, as alleged in Count VI.

### B. Disgorgement

The SEC has requested that the Court enter orders of Disgorgement and Prejudgment Interest against the Defaulting Promoters. In a case involving violation of the federal securities laws, the Court has "'broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged.'" S.E.C. v. Druffner, 802 F. Supp. 2d 293, 297 (D. Mass. 2011) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474-75 (2d Cir. 1996)). The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation," S.E.C. v. Happ, 392 F.3d 12, 31 (1st Cir. 2004) (internal quotations and citation omitted), and the "risk of uncertainty in calculating

11

disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." Id.

With respect to Defendant Wesley Rodrigues, the Commission requests an order of disgorgement in the amount of $147,730, plus pre-judgment interest in the amount of $7,174, for a total judgment of $154,904. With respect to Defendant Viviane Rodrigues, the Commission requests an order of disgorgement in the amount of $434,150, together with pre-judgment interest in the amount of $21,082, for a total judgment of $455,232.

After reviewing the Sixth and Ninth Declarations of John McCann (the SEC's forensic accountant) [ECF Nos. 215-1, 254-1], the Court finds that the disgorgement amounts requested by the SEC represent a reasonable approximation of the profits that Wesley Rodrigues and Viviane Rodrigues obtained through the illegal conduct alleged in the Complaint. Accordingly, the Court will order the disgorgement amounts requested by the Commission.

**C. Civil Penalties**

The SEC further argues that the Court should impose civil penalties upon the Defaulting Promoters pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d). The statute provides in relevant part that:

> [w]henever it shall appear to the Commission that any person has violated any provision of this subchapter . . . the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation.

15 U.S.C. § 77t(d)(1). The statute provides three tiers of penalties, "the amount increasing with the severity of the violation." S.E.C. v. Manterfield, No. CIV A 07-10712-RGS, 2009 WL 935953, at *1 (D. Mass. Apr. 8, 2009). "Tier I penalties are generally applicable . . . Tier II penalties require 'fraud, deceit, manipulation, or a deliberate or reckless disregard of a regulatory requirement,' . . . and Tier III penalties require the Tier II elements plus 'substantial losses or ...

significant risk of substantial losses to other persons.'" S.E.C. v. Kern, 425 F.3d 143, 153 (2d Cir. 2005) (quoting 15 U.S.C. § 77t(d)(2)) (internal citations omitted).

Here, the Commission recommends that the Court impose a Tier I penalty of $7,500 on each of the Defaulting Promoters, which is the maximum amount permitted under the "first tier" category. See 17 C.F.R. § 201.1001 & Tbl. I

The Securities Act directs that the amount of the penalty should be "determined by the court in light of the facts and circumstances." 15 U.S.C. § 77t(d)(2)(A); see Kern, 425 F.3d at 153 ("The tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court."). "Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations." S.E.C. v. Monterosso, 756 F.3d 1326, 1338 (11th Cir. 2014) (citing S.E.C. v. Sargent, 329 F.3d 34, 41 n.2 (1st Cir. 2003)). Courts have also considered factors including the egregiousness of the violation, the defendant's willingness or failure to admit wrongdoing; the isolated or repeated nature of the violations, the degree of scienter involved, the defendant's cooperation or lack thereof with authorities, and the defendant's current financial condition. See S.E.C. v. Converge Glob., Inc., No. 04-80841CV, 2006 WL 907567, at *6 (S.D. Fla. Mar. 10, 2006); S.E.C. v. Cavanagh, No. 98 CIV. 1818DLC, 2004 WL 1594818, at *31 (S.D.N.Y. July 16, 2004).

The Court finds that the Tier I civil penalties requested by the Commission are appropriate and proportional to the Defaulting Promoters' involvement in the Wings Network scheme. Although these Defendants did not create or control Wings Network, they participated in and unjustly profited from the scheme, along with the principal defendants. Thus, the Court finds that an additional civil penalty is necessary and appropriate to deter the Defaulting Promoters from committing further violations of the securities laws. Accordingly, the Court will

impose a civil penalty of $7,500 on both Wesley Rodrigues and Viviane Rodrigues, pursuant to Section 20(d)(2) of the Securities Act, 15 U.S.C. § 77t(d)(2).

### D. Permanent Injunction

The SEC has also requested that the Court enter a permanent injunction enjoining the Defaulting Promoters from committing further violations of the federal securities laws. See 15 U.S.C. § 77t(b). "An injunction is appropriate if the Court determines there is a reasonable likelihood that the defendant will violate the laws again in the future." Druffner, 517 F. Supp. 2d at 513 (citation omitted). To determine whether the defendant is reasonably likely to violate the laws again in the future, the Court looks to "whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future." Id. (quoting SEC v. Bilzerian, 29 F.3d 689, 695 (D.C. Cir. 1994)). In light of the allegations in the Complaint, which describe the Defaulting Promoters' prolonged participation in the unregistered offering of securities by the Wings Network, the Court finds that a permanent injunction is warranted.

### V. CONCLUSION

For the foregoing reasons, the SEC's Motion for a Default Judgment against Wesley Rodrigues and Viviane Rodrigues [ECF No. 215], and the Commission's Supplemental Motion for Default Judgment [ECF No. 254] are hereby ALLOWED as to Defendants Wesley Rodrigues and Viviane Rodrigues.

**SO ORDERED.**

Dated: August 30, 2016         /s/ Allison D. Burroughs
                               ALLISON D. BURROUGHS
                               U.S. DISTRICT JUDGE