UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 15-cv-10543-ADB |
| TROPIKGADGET FZE., et al., | * * | |
| Defendants. | * * | |
| and | * * | |
| UNIVEST FINANCIAL SERVICES CORP., et al., | * * * | |
| Relief Defendants | * | |

**<u>MEMORANDUM AND ORDER ON MOTIONS FOR DEFAULT JUDGMENT AGAINST DEFENDANTS SERGIO TANAKA, CARLOS LUIS DA SILVEIRA BARBOSA, AND CLAUDIO DE OLIVEIRA PEREIRA CAMPOS</u>**

**I.   INTRODUCTION**

In February 2015, Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") filed this civil enforcement action against three companies, fifteen individual defendants, and several relief defendants. This case arises out of an alleged pyramid scheme operated by defendants Tropikgadget FZE and Tropikgadget Unipessoal LDA (collectively, "Tropikgadget"), through their principals, Defendants Sergio Henrique Tanaka ("Tanaka"), Carlos Luis da Silveira Barbosa ("Barbosa"), and Claudio de Oliveira Pereira Campos ("Campos") (collectively, the "Principal Defendants"). The Commission alleges that between November 2013 and April 2014, Tropikgadget, through the actions of its Principals and promoters, raised at least $23.5 million from thousands of investors through a fraudulent and unregistered offering of securities. The securities took the form of membership packs that

promised guaranteed monthly returns in exchange for becoming "promoters" of the business.

The Commission filed its Complaint in this action on February 25, 2015, alleging that Tropikgadget and the Principal Defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), as well as Sections 17(a)(1), (2), and (3) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(1), (2), & (3) (the "Securities Act"). The Complaint also alleges that the Principal Defendants sold and offered for sale unregistered securities in violation of Section 5 of the Securities Act, 15 U.S.C. §§ 77e(a) & (c).

At the time the Complaint was filed, the Principal Defendants were believed to be located in Brazil, and the Commission failed in its attempts to serve the Defendants with process at their previous addresses. The Commission then filed a Motion for alternative service, seeking the Court's permission to serve Tanaka, Barbosa, and Campos by email. [ECF Nos. 102, 103]. The Court allowed the Motion[1] [ECF No. 118], and on June 15, 2015, the Commission served all three Principal Defendants by email. [ECF Nos. 121-123, 125]. None of the Principal Defendants responded to the Complaint. On July 28, 2015, the Court ordered the Clerk to enter Defaults against the Principal Defendants, but asked the Commission to postpone filing any motions for default judgment. [ECF Nos. 144, 174]. On December 1, 2015, the Court allowed the SEC to move forward with motions for default judgments against the Principal Defendants. [ECF No. 188].

Currently before the Court is the Commission's Motion for a Default Judgment against Sergio Henrique Tanaka, Carlos Luis da Silveira Barbosa, and Claudio de Oliveira Pereira

---

[1] Although the Court permitted the Commission to serve the Principal Defendants by email, it declined to issue a final ruling on whether service by email would constitute proper and effective service. The Court further noted that the Defendants were free to challenge the adequacy of service of process at a later time. None of the Principal Defendants, however, has appeared in this action to challenge the sufficiency of service. [ECF No. 118].

2

Campos [ECF No. 213], which is supported by a Memorandum of Law [ECF No. 214], and the Fifth Declaration of John McCann [ECF No. 213-1]. After an August 8, 2016 hearing, the Court requested further information from the Commission regarding the calculation of disgorgement amounts requested from Defendants Tanaka and Barbosa. Subsequently, the Commission submitted a Supplemental Motion for Default Judgment [ECF No. 254], which was supported by the Ninth Declaration of John McCann [ECF No. 254-1], an Affidavit of Deena Bernstein [ECF No. 254-2], and an Affidavit of Paolo Koga [ECF No. 254-3].

For the reasons set forth in this Memorandum and Order, the Commission's Motions for Default Judgment are <u>ALLOWED</u> as to Defendants Tanaka, Barbosa, and Campos.

## II. LEGAL STANDARD

As set forth in Fed. R. Civ. P. 55(b), "a plaintiff 'must apply to the court for a default judgment' where the amount of damages claimed is not a sum certain." <u>Vazquez-Baldonado v. Domenech</u>, 792 F. Supp. 2d 218, 221 (D.P.R. 2011) (quoting Fed. R. Civ. P. 55(b)). As to the issue of liability, the entry of default "constitutes an admission of all facts well-pleaded in the complaint . . . ." <u>Id.</u> (internal quotations and citations omitted). Because the Principal Defendants have been defaulted in this case, they are "taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability." <u>In re The Home Restaurants, Inc.</u>, 285 F.3d 111, 114 (1st Cir. 2002). On a motion for a default judgment, however, it is appropriate to independently "examine a plaintiff's complaint, taking all well-pleaded factual allegations as true, to determine whether it alleges a cause of action." <u>Ramos-Falcon v. Autoridad de Energia Electrica</u>, 301 F.3d 1, 2 (1st Cir. 2002). Assuming that the facts alleged state a viable cause of action, the defendant's liability will be established.

With regard to damages, Fed. R. Civ. P. 55(b)(2) provides that the court "may conduct

hearings or make referrals . . . when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." A hearing, however, is not necessarily required, particularly where the facts alleged in the pleadings, together with affidavits submitted by the moving party, establish the amount of the default judgment. See In re The Home Restaurants, Inc., 285 F.3d at 114 (holding that district court did not abuse its discretion by entering default judgment without first holding evidentiary hearing, where there was "no uncertainty about the amounts at issue," the pleadings contained "specific dollar figures," and the court requested and received affidavits in support of the default judgment).

The Commission argues that the facts alleged in the Complaint establish that the defaulting Principal Defendants violated the federal securities laws by selling and offering to sell unregistered securities in interstate commerce, by making material misrepresentations to investors to obtain money and property, and employing a scheme or artifice to defraud. The SEC further argues that these facts entitle the Commission to a permanent injunction against the Principal Defendants, as well as disgorgement of their ill-gotten gains, together with prejudgment interest. In addition, the SEC seeks civil monetary penalties against each of the Principal Defendants.

In this Memorandum and Order, the Court will address the adequacy of the Complaint for the purpose of establishing liability, as well as the remedies requested by the SEC.

## III.    SUMMARY OF RELEVANT FACTS

The salient facts alleged in the SEC's Complaint, [ECF No. 1] ("Compl.")), are summarized below. The Court accepts these facts as true for purposes of this Motion. See Conetta v. Nat'l Hair Care Centers, Inc., 236 F.3d 67, 76 (1st Cir. 2001) (noting that under the

"prevailing view," the "entry of default prevents the defendant from disputing the truth of well-pleaded facts in the complaint pertaining to liability").

### A. Relevant Defendants

Tropikgadget FZE is a foreign entity incorporated in the United Arab Emirates, with a principal place of business in Lisbon, Portugal. Compl. ¶ 13. Tropikgadget FZE holds the rights to "Wings Network" marketing and brand services, which includes but is not limited to, the names Wings Network, Wingsnetwork, and WingsNetwork.Com (collectively "Wings Network"). Id. Tropikgadget Unipessoal LDA is a foreign entity incorporated in the Madeira Free Trade Zone, with a principal place of business in Lisbon, Portugal. Id. ¶ 12. Neither Tropikgadget entity has ever been registered with the Securities and Exchange Commission, nor has either entity ever registered any offering of securities under the Securities Act or any class of securities under the Exchange Act. Id. ¶ 13.

Tanaka, age 40, of Sao Paulo, Brazil and Davie, Florida, was the founder of the Wings Network and served as president of the Wings Network Board of Directors. Id. ¶¶ 14, 35. Barbosa, of Lisbon, Portugal, was the chief executive officer of the Wings Network. Id. ¶ 15. Campos, also of Lisbon, Portugal, was the Director of Operations of the Wings Network. Id. ¶ 16.

### B. Wings Network operations

The Complaint alleges that Tropikgadget, acting primarily through Defendants Tanaka, Barbosa, and Campos, operated a fraudulent pyramid scheme under the "Wings Network" name.

The Wings Network began operating in the United States on or about November 7, 2013, and quickly built a distribution network of associates or "members." Id. ¶ 35. Defendants presented the Wings Network as a "multi-level marketing" company in the business of providing digital and mobile solutions, such as games, apps, cloud storage, and marketing tools. Id. ¶ 36.

On April 10, 2014, Wings Network launched a Wings Cloud app, which provided access to internet data storage. Id. On May 8, 2014, Wings Network launched a Wings Communicator Voice-over IP communications services app. Id. Both apps were available for free download. Id. Wings Network and Campos described Wings Communicator as a combination of existing apps such as Skype, WeChat, WhatsApp, and Waze. Id.

In actuality, however, the Wings Communicator product was not competitively priced, and Tropikgadget generated little to no revenue from the sale of these products or services. Id. ¶¶ 37, 47. Instead, Tropikgadget's revenues were generated through sales of its "membership packs," which promised members guaranteed monthly returns in exchange for becoming promoters of the Wings Network. Id. ¶¶ 57-60.

As the scheme evolved, Campos also made vague promises that revolutionary new products were in development. Id. ¶¶ 43-45. For example, in a February 27, 2014 online webinar, Campos claimed that Wings Network was developing new products such as "Wings Fly," which he described as an online flight booking service, and "Wings Resort," which he described as a time-share vacation properties company. Id. ¶ 44. Wings Network, however, never launched Wings Fly or Wings Resort. Id. ¶ 45.

The Wings Network originally recruited members through its website and online presentations conducted by Barbosa and Campos. Id. ¶ 48. The first official Wings Network online conference (or webinar) was held on January 30, 2014, and the second on February 13, 2014. Id. ¶ 48. Both presentations were posted on YouTube. After establishing a network of promoters from amongst its initial members, the Wings Network grew rapidly by recruiting new members through face-to-fact contact, and through social media such as Facebook, YouTube, and online conferences. Id. ¶ 49.

Tanaka also appeared in Wings Network promotional videos on the internet. Id. ¶ 14. In February 2014, he traveled to Boston, Massachusetts to appear at a Wings Network "Mega Business Event" and receive an appreciation plaque from Grupo Internacional, a group of leading Wings Network Promoters based in the United States. Id. In addition, at least one promoter told investors to wire payments to Tanaka's personal bank account. Id.

In early April 2014, Wings Network held a USA Launch Party in the Boston, Massachusetts area. Id. ¶ 53. Barbosa and Campos spoke at the event. Campos discussed the Wings Network compensation plan, and the company's various "products," making exaggerated claims about the novelty and security of Wings Cloud. Id. ¶ 53. Similarly, Barbosa mischaracterized the novelty of Wings Network's products and made lulling statements regarding bonus payments. Id.

The Wings Network charged a $49 membership fee to its members. Id. ¶ 54. The company's promotional materials represented that paying this membership fee qualified the member to receive a "sales bonus" equal to 25% of future Wings Network total sales. Id. The initial $49 fee, however, did not entitle the member to participate in the Wings Network compensation plan. Id. Rather, to participate in the compensation plan, the member had to invest in one of three "membership packs," ranging in price from $299 to $1,499. Id. ¶ 55. Each pack came with an increasing number of "points," that could purportedly be exchanged for compensation, as well as a number of tools that the member could use for further promotion of the Wings Network, such as "landing pages," "banners," Facebook ads, and cloud storage. Id. None of the membership packs, however, provided any mechanism for the member to sell the digital and mobile products and services allegedly offered by Wings Network. Id. ¶ 56.

The Wings Network's marketing materials promised that those who purchased

"membership packs" would receive monetary returns for their investments and for their successful recruitment of additional members. Id. ¶ 57. The Wings Network had eight bonus plans for members who recruited new investors. Id. ¶ 58. Only one of those eight plans – the "sales bonus" plan – had any relationship to the sale of an actual product or service. Id. Wings Network, however, never made any payments to any member based upon the "sales bonus" plan. Id. Rather, members were paid according to a system of "points," based on (1) the number of additional members the member recruited; (2) the number of additional members recruited by those members that the member recruited; (3) the number of total membership products sold throughout the Wings Network; and (4) the price level of the membership packs purchased. Id. Wings Network's revenues derived solely from selling membership packs, and Wings Network's records reflect no revenue from sales of actual products or services. Id. ¶ 64. Further, Wings Network promoters represented to investors that no product sales were required to receive compensation from the company. Id. ¶ 60.

The Complaint further alleges that Barbosa and Campos made a number of fraudulent and misleading statements in connection with their recruitment of new investors. For example, during presentations to potential investors, Barbosa showed potential investors copies of what he claimed was Wings Network's application to join the "Direct Selling Association" ("DSA"). Id. ¶ 66. The DSA is a national trade association of approximately 200 multilevel marketing companies, which promotes the interests of its members and maintains a Code of Ethics as a condition of membership. Id. Companies are admitted to the DSA only after a vetting period. Id. ¶ 67. The Wings Network's principals falsely claimed that the company had successfully passed a "pre-analysis" or "pre-screening" process for the DSA, including a preliminary review of the sustainability and legality of the company. Id. ¶ 68. In actuality, however, the DSA does not

have a pre-analysis or pre-screening process, and the DSA's records do not reflect any application for membership or membership in the name of Wings Network. Id. ¶ 70. In fact, the DSA sent Wings Network a cease and desist letter in April 2014, requesting that Wings Network cease its claims of affiliation with DSA. Id. ¶ 72.

Campos also falsely represented to prospective investors that their initial investments in the "Member Packs" would be 100% guaranteed through an insurance policy. Id. ¶ 73. In addition, Barbosa and Campos further represented that investors could receive full refunds if they cancelled their investment within fourteen days of signing up as members. Id. ¶ 74. Investors, however, reported that Wings Network failed to provide such refunds, even after multiple requests. Id.

The Complaint further alleges that the Principal Defendants received Wings Network investors' funds, and made limited payouts to investors, through Tropikgadget Unipessoal LDA's bank accounts. Id. ¶ 12. But while Barbosa, Campos, and several other Wings Network promoters promised payments to investors in exchange for their recruitment of new members, many investors never received any such payments. Id. ¶ 75. According to the Wings Network compensation plan, Wings Network members earned "points" that could be redeemed for cash commissions. Id. But many investors who attempted to redeem their points were unable to withdraw any money. Id. Barbosa and Campos also promised members that they would be able to withdraw their money utilizing a "Wings Card," which would enable transfers from the member's Wings Network account to a debit card. Many investors, however, never received a Wings Card, and most of those who did receive cards found that the cards did not work as promised. Id. ¶ 77.

Tropikgadget voluntarily suspended its U.S. operations in May 2014, after the

Massachusetts Securities Division filed an Administrative Complaint alleging that the Wings Network was operating a fraudulent pyramid scheme. Id. ¶ 13.

**IV.    DISCUSSION**

The SEC's Complaint asserts six claims for relief against the Principal Defendants. Counts I and II allege that the Principal Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), (b), and (c) thereunder. See 17 C.F.R. § 240.10b-5(a), (b), & (c). These provisions prohibit any person, in connection with the purchase or sale of any security, from, directly or indirectly: 1) employing any device, scheme or artifice to defraud; (2) making any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) engaging in any transaction, practice or course of business that operates or would operate as a fraud or deceit upon any person. See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

Counts III, IV, and V allege that the Principal Defendants violated Sections 17(a)(1), (2), and (3) of the Securities Act, 15 U.S.C. § 77q(a)(1), (2), & (3). Section 17(a) prohibits, in the offer or sale of securities: (1) employing devices, schemes or artifices to defraud; (2) obtaining money or property by means of materially false or misleading statements; and (3) engaging in transactions, practices or courses of business that operate as a fraud or deceit. See 15 U.S.C. § 77q(a).

Finally, Count VI alleges that the Principal Defendants violated Section 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a) & (c). Section 5(a) provides that, unless a registration statement is in effect, it is unlawful for any person, directly or indirectly, to sell securities through the use of any means or instruments of interstate commerce. 15 U.S.C. § 77e(a). Section

5(c) provides for a similar prohibition against offers to sell, or offers to buy, unless a registration statement has been filed. 15 U.S.C. § 77e(c).

Assuming that all facts alleged in the Complaint are true, the Court finds that they sufficiently support the claims alleged against the Principal Defendants.

### A. Sale and Offering of Unregistered Securities

Count VI of the Commission's Complaint alleges that the Principal Defendants violated Section 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a) & (c). A *prima facie* case for a violation of Sections 5(a) and 5(c) requires a showing that: (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly offered to sell the securities; and (3) the offer or sales were made in connection with the use of interstate transportation, communication, or the mails. See SEC v. Spence & Green Chem. Co., 612 F.2d 896, 901-02 (5th Cir. 1980).

Here, the facts alleged in the Complaint establish that all of the Principal Defendants violated Section 5. First, the Complaint alleges that the Principal Defendants were engaged in the sale or offering for sale of "securities," as that term is defined in the Securities Act and the Exchange Act. Both statutes define "security" to include "investment contracts." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). Under the three-part test established by the Supreme Court in SEC v. W.J. Howey Co., 328 U.S. 293 (1946), an investment contract comprises "(1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party." S.E.C. v. SG Ltd., 265 F.3d 42, 46 (1st Cir. 2001) (citing Howey, 328 U.S. at 298-99). "This formulation," however, "must be applied in light of the economic realities of the transaction," id., and the courts have adopted a "broad construction" of what may constitute an investment contract, "aspiring 'to afford the investing

public a full measure of protection.'" Id. at 47 (quoting Howey, 328 U.S. at 298).

As the Court has already ruled, the Wings Network's sale of "membership packs" to prospective members constitutes an investment contract. The marketing materials for Wings Network promised that those who purchased "membership packs" would receive monetary returns on their investments, contingent on the successful recruitment of additional members. Compl. ¶ 57. The First Circuit has held that such promises satisfy the "commonality" element of the Howey test. See SG Ltd., 265 F.3d at 51 (noting that Ponzi schemes "typically satisfy the horizontal commonality standard").

The Complaint also adequately alleges that the Principal Defendants personally engaged in these unregistered sales and offerings of securities, in violation of Section 5(a) and 5(c) of the Securities Act. Tanaka, Campos, and Barbosa actively promoted the Wings Network and its membership packs by speaking at promotional conferences, appearing in promotional videos and online conferences, and posting promotional material on social media. See Compl. ¶¶ 14-16, 48, 52, 53.

Finally, the Complaint adequately alleges that these sales and offerings were made in connection with the use of interstate transportation, communication, or the mails. (Id. ¶¶ 10, 21, 25). Thus, the Commission has established that Tanaka, Campos, and Barbosa violated Section 5(a) and 5(c) of the Securities Act, as alleged in Count VI.

**B. Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act**

The SEC has also alleged sufficient facts to make out a *prima facie* case that the Principal Defendants violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

First, the Complaint adequately alleges that Barbosa and Campos made false and

misleading statements in connection with the offering and sale of Wings Network membership packs, in violation of Section 10(b) of the Exchange Act, and Section 17(a)(2) of the Securities Act. Both Barbosa and Campos made false and misleading statements about Wings Network's purported products, services, and technology (1) on the Wings Network website; (2) during live presentations; (3) through YouTube videos and other online presentations; and (4) in marketing materials and other documents. Campos also made misleading statements to investors about purported new products such as Wings Fly and Wings Resort, which never actually launched. Barbosa made further misstatements to investors about Wings Network's membership in DSA, and Campos falsely represented to prospective investors that their investments would be guaranteed through an insurance policy. In addition, both Barbosa and Campos falsely represented that investors could receive full refunds if they cancelled their investment within fourteen days. The Commission has also adequately alleged that these misrepresentations were material, *i.e.*, that there was a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 38 (2011) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).[2] Additionally, and for the purposes of Section 17(a)(2) of the Securities Act, the Commission has alleged that Barbosa and Campos made these false and misleading statements for the purpose of obtaining money or property from potential investors.

Further, the Commission has plead sufficient facts to establish that all three Principal Defendants – Tanaka, Barbosa, and Campos – were engaged in a fraudulent scheme to defraud

---

[2] The Commission need not prove that any investors actually relied on the misrepresentations, or that any investors were harmed. See S.E.C. v. Tambone, 597 F.3d 436, 447 n.9 (1st Cir. 2010).

investors, in violation of Section 17(a)(1) & (3) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) thereunder. The Complaint alleges that the Principal Defendants created, operated, and promoted an extensive pyramid scheme, in which they deceived investors into believing that (1) the Wings Network generated revenues from the sale of legitimate products and services; and (2) that investors would earn returns on their investments through the sales of additional membership packs.

The SEC has also adequately alleged that the Principal Defendants acted with scienter, as required to state a claim under Section 17(a)(1) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. See S.E.C. v. Ficken, 546 F.3d 45, 47 (1st Cir. 2008) ("Proof of scienter is required to establish violations of § 17(a)(1), § 10(b), or Rule 10b–5 . . . .").[3] Scienter may be established by indirect evidence, and "may extend to a form of extreme recklessness . . . ." In re Cabletron Sys., Inc., 311 F.3d 11, 38 (1st Cir. 2002). The nature of the Principal Defendants' scheme or artifice was to present the Wings Network as a legitimate multi-level marketing company offering actual products and services, and to conceal the fact that the company had no legitimate revenue stream and was operating as a classic pyramid scheme. The nature of the Defendants' scheme adequately supports the requisite inference of scienter.

**C. Disgorgement**

The Commission requests that the Court enter an Order of Disgorgement and Prejudgment Interest against two of the Principal Defendants – *i.e.*, Barbosa and Tanaka.[4] In a case involving violation of the federal securities laws, the Court has "'broad discretion not only

---

[3] Scienter is not required to state a claim under Sections 17(a)(2) and 17(a)(3) of the Securities Act; mere negligence is sufficient to establish liability. See Ficken, 546 F.3d at 47.

[4] Because the Commission was not able to identify any ill-gotten gains by Defendant Campos, the Commission is not seeking disgorgement from him.

in determining whether or not to order disgorgement but also in calculating the amount to be disgorged.'" S.E.C. v. Druffner, 802 F. Supp. 2d 293, 297 (D. Mass. 2011) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474-75 (2d Cir. 1996)). The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation," S.E.C. v. Happ, 392 F.3d 12, 31 (1st Cir. 2004) (internal quotations and citation omitted), and the "risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." Id.

With respect to Defendant Tanaka, the Commission requests an order of disgorgement in the amount of $1,711,059, plus pre-judgment interest in the amount of $83,088, for a total judgment of $1,794,147. Against Defendant Barbosa, the Commission requests an order of disgorgement in the amount of $143,324, plus pre-judgment interest in the amount of $6,960, for a total judgment of $150,284.

After reviewing the Fifth and Ninth Declarations of John McCann (the SEC's forensic accountant) [ECF Nos. 213-1, 254-1], as well as the Affidavits of Deena Bernstein and Paolo Koga [ECF Nos. 254-2, 254-3], the Court finds that the disgorgement amounts requested by the SEC represent a reasonable approximation of the profits that Defendants Tanaka and Barbosa obtained through the illegal conduct alleged in the Complaint. Accordingly, the Court will order the disgorgement amounts requested by the Commission.

**D. Civil Penalties**

The SEC further argues that the Court should impose civil penalties upon the defaulting Principal Defendants pursuant to Section 20(d)(2) of the Securities Act, 15 U.S.C. § 77t(d)(2), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(i). These statutes provide in relevant part that:

> [w]henever it shall appear to the Commission that any person has violated any provision of this chapter . . . the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation.

15 U.S.C. § 78u(d)(3)(A); see also 15 U.S.C. § 77t(d)(1) (same language).

"Both statutes provide three tiers of penalties, the amount increasing with the severity of the violation." S.E.C. v. Manterfield, No. CIV A 07-10712-RGS, 2009 WL 935953, at *1 (D. Mass. Apr. 8, 2009). "Tier I penalties are generally applicable . . . Tier II penalties require 'fraud, deceit, manipulation, or a deliberate or reckless disregard of a regulatory requirement,' . . . and Tier III penalties require the Tier II elements plus 'substantial losses or ... significant risk of substantial losses to other persons.'" S.E.C. v. Kern, 425 F.3d 143, 153 (2d Cir. 2005) (quoting 15 U.S.C. § 77t(d)(2)) (internal citations omitted).

Here, the Commission seeks a $150,000 civil monetary penalty against each of the Principal Defendants, which is the maximum Tier III penalty for a natural person. See 17 C.F.R. § 201.1005 & Tbl I. The Court finds such penalties to be necessary and appropriate under the circumstances. The allegations in the Complaint establish that Tanaka, Campos, and Barbosa conducted a large-scale pyramid scheme that defrauded thousands of investors, and generated more than $20 million in ill-gotten proceeds over a seven-month period. Furthermore, the facts alleged are sufficient to establish that the Principal Defendants committed fraudulent acts with knowledge and intent. The Court has also considered that the Principal Defendants have not appeared in this action to defend against these allegations, or to take responsibility for their actions. Accordingly, third-tier penalties are warranted, and the Court will impose $150,000 civil monetary penalties against Defendants Tanaka, Campos, and Barbosa.

### E. Permanent Injunction

The SEC has also requested that the Court enter a permanent injunction enjoining the

Principal Defendants from committing further violations of the federal securities laws. See 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1). "An injunction is appropriate if the Court determines there is a reasonable likelihood that the defendant will violate the laws again in the future." Druffner, 517 F. Supp. 2d at 513 (citation omitted). To determine whether the defendant is reasonably likely to violate the laws again in the future, the Court looks to "whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future." Id. (quoting SEC v. Bilzerian, 29 F.3d 689, 695 (D.C. Cir. 1994)). In light of the allegations in the Complaint, which describe the Principal Defendants' formation and execution of a scheme to defraud investors over a seven-month period, the Court finds that a permanent injunction is warranted.

## V. CONCLUSION

For the foregoing reasons, the Commission's Motion for a Default Judgment against Sergio Henrique Tanaka, Carlos Luis da Silveira Barbosa, and Claudio de Oliveira Pereira Campos [ECF No. 213], and the Commission's Supplemental Motion for Default Judgment [ECF No. 254] are hereby ALLOWED as to Defendants Tanaka, Campos, and Barbosa.

**SO ORDERED.**

Dated: August 30, 2016         /s/ Allison D. Burroughs
                               ALLISON D. BURROUGHS
                               U.S. DISTRICT JUDGE