UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> TROPIKGADGET FZE, et al. <br><br> Defendants. | Civil Action No. 15-cv-10543-ADB |

# MEMORANDUM AND ORDER GRANTING SUMMARY JUDGMENT TO PLAINITFF FOR COUNTS AGAINST DEFENDANTS ANDREW ARRAMBIDE, UNINVEST FINANCIAL SERVICES CORPORATION, PARKWAY REAL ESTATE LLC, RST5 INVESTMENTS LLC, AND PAULO KOGA

BURROUGHS, D.J.

In February 2015, Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") filed this civil enforcement action against two companies, fifteen individual defendants, and several relief defendants. This case arises out of an alleged pyramid scheme operated by defendants Tropikgadget FZE and Tropikgadget Unipessoal LDA (collectively, "Tropikgadget") and Tropikgadget's agents, including Andrew Arrambide ("Arrambide"). The relief defendants allegedly received wire transfers from Tropikgadget consisting of illicit proceeds and profits of the alleged pyramid scheme. Four of those relief defendants are Uninvest Financial Services Corporation ("Uninvest"), Parkway Real Estate LLC ("Parkway"), RST5 Investments LLC ("RST5"), and Paulo Koga ("Koga") (for the purposes of this memorandum, collectively, "the relief defendants"). Now pending before this Court are the SEC's motions for summary judgment against Arrambide [ECF No. 245] and the aforementioned relief defendants [ECF No. 289]. The motions for summary judgment as well as related requests for disgorgement,

fines, and injunctive relief, have not been opposed. [ECF Nos. 280, 295]. For the reasons discussed below, this Court GRANTS both motions for summary judgment and awards appropriate relief.

**I.     LEGAL STANDARD**

"Summary judgment is appropriate when the record shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue is one that can 'be resolved in favor of either party' and a material fact is one which 'has the potential of affecting the outcome of the case.'" Gerald v. Univ. of P.R., 707 F.3d 7, 16 (1st Cir. 2013) (quoting Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)); see also Walker v. President & Fellows of Harvard Coll., 840 F.3d 57, 61 (1st Cir. 2016). This analysis does not permit the judge "to weigh the evidence and determine the truth of the matter," but focuses solely on "whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). The factual record on summary judgment may consist of "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The Court can also consider all uncontested facts. Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 5 (1st Cir. 2003). When, as in this case, a motion for summary judgment is unopposed, a court cannot simply grant summary judgment to the moving party, see Cordero-Soto v. Island Fin., Inc., 418 F.3d 114, 118 (1st Cir. 2005), but rather "must inquire whether the moving party has met its burden to demonstrate undisputed facts entitling it to summary judgment as a matter of law." Id. (quoting Lopez v. Corporación Azucarera de P.R., 938 F.2d 1510, 1516 (1st Cir. 1991).

## II. SUMMARY OF RELEVANT FACTS

The salient portions of the Statements of Undisputed Material Facts submitted by the SEC accompanying its two motions, [ECF Nos. 248, 291], are summarized below. Tropikgadget FZE is a foreign corporation that holds the rights to the "Wings Network" marketing and brand services. [ECF No. 248-3 at 2, 29]. Tropikgadget promoted the Wings Network as a "multi-level marketing" company, [ECF No. 8 at ¶ 4], that offered "a global sales channel of Online and Mobile Marketing Solutions" [ECF No. 248-13 at 3]. Tropikgadget Unipessoal handled cash from investments in the Wings Network and also disbursed cash to investors in the Wings Network. [ECF No. 9 at ¶¶ 5, 11, 15]. Tropikgadget FZE and Tropikgadget Unipessoal, and in turn the Wings Network, were controlled by three men: Sergio Henrique Tanaka, Carlos Luis da Silveira Barbosa, and Claudio de Oliveira Pereira Campos. [ECF No. 179 at 5, 13]. Tropikgadget has never been registered with the SEC and it has never registered any offering of securities under the Securities Act of 1933 (the "Securities Act") or any class of securities under the Exchange Act of 1935 (the "Exchange Act"). [ECF No. 10 at ¶ 5].

Although the Wings Network purported to use a multi-level distribution network to sell marketing products and services, it generated little to no revenue from the sale of those products or services. Instead, to the extent that it and its members obtained revenue, that revenue was derived from the recruitment of new members. [ECF No. 248-15 at 1]. Rather than actually selling product, the Wings Network focused on simply recruiting more investors. [ECF No. 8 at ¶¶ 5–6].

The Wings Network established a network of lead promoters from amongst its initial members, and then grew rapidly by recruiting new members using traditional face-to-face sales and social media. [ECF Nos. 248-6 at 11; 10 at ¶¶ 6–7]. The Wings Network promised returns to

3

investors that were based solely on amounts invested and additional members recruited, which incentivized current members to recruit additional members, rather than to sell product. [ECF Nos. 248-18]. Members of the Wings Network were paid according to a system of "points," based on (1) the number of additional members the member recruited; (2) the number of additional members recruited by those members that the member recruited; (3) the number of total membership products sold throughout the Wings Network; and (4) the price level of the membership packs purchased. [ECF Nos. 248-14; 248-18].

Promoters like Arrambide encouraged people to purchase memberships in Wings Network as investments. [ECF No. 248-10 at 27:14–28:5]. The Wings Network charged a $49 membership fee to its members. [ECF No. 248-14 at 11]. The company's promotional materials represented that paying this membership fee qualified the member to receive a "sales bonus" equal to 25% of future Wings Network total sales. [ECF 248-18 at 3]. The initial $49 fee, however, did not entitle the member to participate in the Wings Network compensation plan. [ECF No. 248-14 at 11–12]. Rather, to participate in the compensation plan, the member had to invest in one of three "membership packs," ranging in price from $299 to $1,499. Id. at 12. Each pack came with an increasing number of "points," that could purportedly be exchanged for compensation, as well as a number of tools that the member could use for further promotion of the Wings Network, such as "landing pages," "banners," Facebook ads, and cloud storage. Id.

Arrambide, who lives in Utah, became involved with the Wings Network as a promoter in December 2013. [ECF No. 248-10 at 5:10–15, 15:6–20]. He acted as an independent distributor for the Wings Network, and received a commission for each person that he recruited to join the network. Id. at 21:22–22:3, 22:24–23:3. He achieved the "Director" rank within the Wings Network, meaning that he generated at least $6 million in investments, which, in his case,

came from approximately 50 to 60 investors and for which he personally received over $100,000. Id. at 32:20–25, 33:1–5, 34:11–35:14, 36:10–37:5; [ECF No. 248-5 at 9]. Arrambide appeared in videos promoting the Wings Network, participated in monthly online conferences for the network, promoted it on Facebook and his personal website, traveled from Utah to Boston to promote the network, and spoke at a "Wings Network Mega Business Event" in Boston. [ECF Nos. 248-10 at 40:8–22, 41:25–42:8, 43:5–17; 248-6 at 11; 248-11 at 2].[1] Arrambide never sold any actual product. [ECF No. 248-10 at 26:7–27:13].

The relief defendants handled cash associated with the Wings Network. Uninvest is a Florida corporation, created to act as an intermediary by receiving deposits from people affiliated with the Wings Network scheme. [ECF Nos. 291-2 at ¶ 7; 67 at ¶ 29]. Koga is the president and a director of Uninvest. [ECF Nos. 291-2 at ¶ 2; 67 at ¶ 29]. Parkway is a Florida corporation, managed by Uninvest. [ECF No. 67 at ¶ 32]. RST5 is a Delaware corporation, also managed by Uninvest. Id. at ¶ 33. According to SEC calculations, Uninvest received net deposits and credits associated with the Wings Network amounting to $8,917,594. [ECF No. 291-1 at ¶ 7]. Uninvest then made the following transfers of money from its accounts: $1,935,716 to RST5, $290,700 to Parkway, and $537,411 to Koga. Id. at ¶ 9. The SEC maintains that each of those transfers unjustly enriched the receiving defendant. Id. at ¶ 11. Adding prejudgment interest, the SEC calculates that each of the relief defendants was unjustly enriched in the following amounts: $2,018,765 for RST5, $312,185 for Parkway, and $528,344 for Koga. Id. at ¶ 12. Subtracting the disbursements to RST5, Parkway, and Koga from the total Wings Network deposits to Uninvest,

---

[1] ECF No. 248-11 is a Request for Admission sent by the SEC to Arrambide. Arrambide did not respond to this Request for Admission. [ECF No. 248-2]. Pursuant to Federal Rule of Civil Procedure 36(a)(3), a matter in a request for admission is admitted if the requested party does not respond within 30 days. As such, the Court views all requests for admission within ECF No. 248-11 to be admitted.

the SEC calculates that Uninvest received $4,469,033 in unjust enrichment from its involvement with the Wings Network, id. at ¶ 10, and that, with interest, the total comes to $4,815,892. Id. at ¶ 12.

## III. DISCUSSION

### a. Liability of Arrambide

#### i. Violation of Sections 5(a) and 5(c)

The SEC argues that Arrambide violated sections 5(a) and 5(c) of the Securities Act of 1933, now codified at 15 U.S.C. § 77e. [ECF No. 1 at ¶¶ 92–95]. Section 5(a) provides that, unless a registration statement is in effect, it is unlawful for any person, directly or indirectly, to sell securities through the use of any means or instruments of interstate commerce. 15 U.S.C. § 77e(a). Section 5(c) provides a similar prohibition against offers to sell, or offers to buy, unless a registration statement has been filed. 15 U.S.C. § 77e(c). A *prima facie* case for violations of Sections 5(a) and 5(c) requires a showing that: (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly offered to sell the securities; and (3) the offer or sales were made in connection with the use of interstate transportation, communication, or the mails. See SEC v. Spence & Green Chem. Co., 612 F.2d 896, 901–02 (5th Cir. 1980).

The existence of a security, as defined by statute, is necessary for a violation of Section 5. The Securities Act of 1933 defines the word "security" to include "investment contract[s]." 15 U.S.C. § 77b(a)(1). Under the three-part test established by the Supreme Court in SEC v. W.J. Howey Co., 328 U.S. 293 (1946), an investment contract comprises "(1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party." SEC. v. SG Ltd., 265 F.3d 42, 46 (1st Cir. 2001) (citing Howey, 328 U.S. at 298–99). "This formulation," however, "must be applied in

light of the economic realities of the transaction," id., and courts have adopted a "broad construction" of what may constitute an investment contract, "aspiring 'to afford the investing public a full measure of protection.'" Id. at 47 (quoting Howey, 328 U.S. at 298).

As this Court has already ruled, the Wings Network's sale of "membership packs" to prospective members constituted an investment contract. [ECF No. 179 at 10]. The marketing materials for the Wings Network promised that those who purchased "membership packs" would receive monetary returns on their investments, contingent on the successful recruitment of additional members. The First Circuit has held that such promises satisfy the "commonality" element of the Howey test. See SG Ltd., 265 F.3d at 51 (noting that investments in Ponzi schemes typically qualify as investment contracts). As such, the SEC has met its burden to show that Arrambide sold securities.

The SEC has also met its burden to show that Arrambide violated Sections 5(a) and 5(c). It is an uncontested fact that the investments in the Wings Network were never registered as securities, and that Tropikgadget, the owner of the Wings Network, never registered any securities offering with the SEC. There is also no dispute that Arrambide sold and offered to sell unregistered investments in the Wings Network. Finally, there is no dispute that Arambide's sale of these investments utilized interstate transportation and communication. Arrambide traveled from Utah to Massachusetts to promote the Wings Network, and also promoted the Wings Network using the internet. See United States v. Chiaradio, 684 F.3d 265, 281 (1st Cir. 2012) (anything that travels via the internet travels in interstate commerce). There is therefore no genuine issue as to material fact on this count, and the SEC is entitled to summary judgment regarding Arrambide's violation of Sections 5(a) and 5(c).

### ii. Injunctive Relief, Disgorgement, and a Civil Penalty Against Arrambide

The SEC requests an injunction against Arrambide enjoining him from violating federal securities laws in the future, an order of disgorgement of profits against Arrambide, and an order that he pay a civil penalty. [ECF Nos. 245-1, 246 at 16–18]. The Securities Act permits the SEC to seek injunctive relief against parties who violate the provisions of that statute. 15 U.S.C. § 77t(b). The Court has broad authority to grant such an injunction. "In any action or proceeding brought or instituted by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). "An injunction is appropriate if the Court determines there is a reasonable likelihood that the defendant will violate the laws again in the future." SEC v. Druffner, 517 F. Supp. 2d 502, 513 (D. Mass. 2007) (citation omitted). To determine whether the defendant is reasonably likely to violate the laws again in the future, the Court looks to "whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future." Id. (quoting SEC v. Bilzerian, 29 F.3d 689, 695 (D.C. Cir. 1994)).

In light of the record before this Court, there is a reasonable likelihood that Arrambide will violate securities laws in the future. Arrambide extensively promoted the Wings Network pyramid scheme, and his efforts generated $6 million from investors in the network. The Court also earlier determined that permanent injunctions are appropriate against other defendants in this suit. [ECF Nos. 179, 255]. Therefore, the Court concludes that a permanent injunction against Arrambide is also appropriate.

The SEC also requests that the Court order Arrambide to disgorge his profits from his work with the Wings Network. In a case involving violations of federal securities laws, the Court has "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." SEC v. Druffner, 802 F.Supp.2d 293, 297 (D. Mass. 2011) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474–75 (2d Cir. 1996)). The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation," SEC v. Happ, 392 F.3d 12, 31 (1st Cir. 2004) (internal quotations and citation omitted), and the "risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." Id.

John McCann, a forensic accountant at the SEC, calculated Arrambide's profits from the Wings Network scheme and submitted a full description of those calculations. [ECF No. 248-1]. In order to estimate the appropriate disgorgement figure in this case, McCann reviewed Arrambide's monthly bank statements and the underlying transactions from approximately November 2013 through June 2014, as well as Arrambide's deposition testimony [ECF No. 248-10] to identify deposits into those accounts related to the Wings Network. [ECF No. 248-1 at ¶ 7]. McCann determined which deposits were likely from the Wings Network by noting which deposits were labeled as from the Wings Network and deposits that were multiples of Wings Network membership pack prices. Id. Using this method, McCann found that likely Wings Network-related deposits between November 2013 and June 2014 totaled approximately $136,426. Id.

McCann then used a similar method to identify disbursals from those accounts for expenses related to the Wings Network. Id. at ¶ 8. McCann ascertained these disbursals by identifying payments to Uninvest, Vinicius Aguiar (a member of the Wings Network promotion

team), and cash withdrawals identified by Arrambide in his deposition as related to the Wings Network. Id. McCann determined the total relevant disbursements amounted to $43,882. Id. Subtracting these disbursements from the deposits, McCann found the profits subject to disgorgement amounted to $92,544. Id. at ¶ 9. Using the IRS interest rate for underpayment of taxes, McCann calculated that the prejudgment interest amounted to $6,524.46 from June 1, 2014 (the end date of the Wings Network scheme) to July 31, 2016. Id. at ¶ 10. Profits subject to disgorgement plus prejudgment interest therefore total $99,068.46. Id. The Court concludes that the SEC's proposed disgorgement amount represents a reasonable calculation of the profits causally connected to Arrambide's violations. Therefore, the Court will order that Arrambide disgorge $99,068.46.

Finally, the SEC requests an order requiring Arrambide to pay a civil penalty for his violations of Section 5 of the Securities Act. The SEC has not requested a specific amount for the penalty. The amount of such a penalty is "determined by the court in light of the facts and circumstances." 15 U.S.C. § 77t(d)(2). The Securities Act establishes a "three-tier system" for civil penalties, "the amount increasing with the severity of the violation." SEC v. Manterfield, No. 07-cv-10712-RGS, 2009 WL 935953, at *1 (D. Mass. Apr. 8, 2009). "Tier I penalties are generally applicable . . . Tier II penalties require 'fraud, deceit, manipulation, or a deliberate or reckless disregard of a regulatory requirement,' . . . and Tier III penalties require the Tier II elements plus 'substantial losses or . . . significant risk of substantial losses to other persons.'" SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005) (quoting 15 U.S.C. § 77t(d)(2)) (internal citations omitted).

The Court has imposed civil penalties against other defendants in this suit. [ECF Nos. 179, 255, 256]. In a prior order in this case, defendants who participated in and benefited from

the Wings Network but who did not control the Wings Network scheme received Tier I penalties. [ECF No. 255]. Arrambide extensively promoted the Wings Network and profited from it, but did not control the scheme. Therefore, in light of the statutory scheme and the past decisions of this Court, the Court concludes that the maximum Tier I penalty is an appropriate civil penalty. Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 and 17 C.F.R. § 201.1001, the maximum Tier I civil penalty under § 77t(d)(2)(A) is $7,500 for the time period in which Arrambide violated the Securities Act. Accordingly, the Court will impose a civil penalty of $7,500 on Arrambide.

### b. Liability of the Relief Defendants.

The SEC also moves for summary judgment against the relief defendants. [ECF No. 289]. In a case arising under the federal securities laws, "[a] court can obtain equitable relief from a non-party against whom no wrongdoing is alleged if it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them." SEC v. Cherif, 933 F.2d 403, 414 n.11 (7th Cir.1991); see also SEC v. Pinez, 989 F. Supp. 325, 337 (D. Mass. 1997). To recover on a theory of unjust enrichment, the SEC must show that the defendant was enriched and that "the circumstances dictate that, in equity and good conscience, the defendant should be required to turn over its money to the plaintiff." Universal City Studios, Inc. v. Nintendo Co., 797 F.2d 70, 79 (2d Cir. 1986). The relief defendants received ill-gotten funds as a result of the Wings Network scheme and have no legitimate claim to those funds because they gave no consideration in exchange for the funds, such as providing goods or services.

The SEC requests an order directing the relief defendants to disgorge funds received from the Wings Network scheme along with prejudgment interest. According to the calculations by McCann, Uninvest received deposits and credits associated with the Wings Network and

disbursed portions of those deposits to RST5, Parkway, and Koga. [ECF No. 291-1 at ¶¶ 7, 9]. There is no evidence that the relief defendants gave Tropikgadget legitimate goods or services in return for the deposits. Using the same methods as used to calculate funds for disgorgement, McCann calculated that each relief defendant was unjustly enriched in the following amounts: $4,815,892 for Uninvest; $2,018,765 for RST5; $528,344 for Koga; and $312,185 for Parkway. Id. at ¶ 12. The Court credits McCann's calculations and finds these amounts to be reasonable. As such, this Court will order the disgorgement amounts requested by the SEC.

## IV. CONCLUSION

For the reasons stated above, the Court hereby GRANTS the SEC's motion for summary judgment against Arrambide [ECF No. 245] and the SEC's motion for summary judgment against the relief defendants—Uninvest, RST5, Parkway, and Koga [ECF No. 289]. All of the relief requested by the SEC is allowed, and orders to that effect accompany this memorandum.

**SO ORDERED.**

February 23, 2017 /s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE